**In re PETTERS COMPANY, INC., et al., Debtors.**

(includes: Petters Group Worldwide, LLC; PC Funding, LLC; Thousand Lakes, LLC; SPF Funding, LLC; PL Ltd., Inc. Edge One LLC; MGC Finance, Inc.; PAC Funding, LLC; Palm Beach Finance Holdings, Inc.).

Nos. 08–45257, 08–45258(GFK), 08–45326(GFK), 08–45327(GFK), 08–45328(GFK), 08–45329(GFK), 08–45330(GFK), 08–45331(GFK), 08–45371(GFK), 08–45392(GFK).

United States Bankruptcy Court, D. Minnesota.

June 19, 2013.

Kirstin D. Kanski, Terrence J. Fleming, K. Jon Breyer, Adam C. Ballinger, Mark D. Larsen, James A. Lodoen, Sandra S. Smalley–Fleming, Jeffrey D. Smith, Lindquist & Vennum LLP, Minneapolis, MN, Sarah E. Doerr, Issa K. Moe, Moss &

Barnett, Minneapolis, MN, Richard B. Drubel, Ethan Frechette, Matthew J. Henken, Kimberly H. Schultz, Boies, Schiller & Flexner LLP, Hanover, NH, Joseph L. Fogel, Michael J. Kelly, Neal H. Levin, Patrick J. Woytek, Freeborn & Peters LLP, Chicago, IL, Adam A. Gillette, Lori A. Johnson, Thomas E. Jamison, Fruth Jamison & Elsass PLLC, Minneapolis, MN, Stacy L. Kabele, Josiah O. Lamb, Patricia A. Pedersen, George H. Singer, Kelley Wolter & Scott PA, Minneapolis, MN, for Douglas A Kelley, Trustee.

Ethan Frechette, Richard B. Drubel, Boies, Schiller & Flexner LLP, Hanover, NH, James A. Lodoen, Lindquist & Vennum P.L.L.P, Minneapolis, MN, for Petters Company, Inc., Debtor.

Michael R. Fadlovich, Robert Raschke, Michael E. Ridgway, US Trustee Office, Minneapolis, MN, for U.S. Trustee.

## FIRST MEMORANDUM ON "CONSOLIDATED ISSUES" TREATMENT OF MOTIONS FOR DISMISSAL IN TRUSTEE'S LITIGATION FOR AVOIDANCE AND RECOVERY: STATUTE OF LIMITATIONS AND TIMELINESS OF SUIT

GREGORY F. KISHEL, Chief Judge.

### PREFACE

These bankruptcy cases were commenced after the collapse of the enterprise structure of Thomas J. Petters, a Minnesota-based business promoter. In early October, 2008, Tom Petters was arrested and charged with multiple fraud-based federal criminal offenses. The United States District Court for this district (Montgomery, J.) appointed Douglas A. Kelley, Esq. as receiver, to take control of the assets of Tom Petters. Those assets included exclusive ownership interests in numerous artificial business entities that Tom Petters had controlled, most of which he had created himself. Between October 11, 2008 and October 19, 2008, the Receiver filed petitions to commence cases under Chapter 11 for the debtor-entities named above. Kelley was later appointed as Trustee pursuant to 11 U.S.C. § 1104(a) for all of these cases.[1]

After the arrest of Tom Petters, the complicated activity that he had purveyed through his enterprise structure was termed a "Ponzi scheme" in local and national media. That nomenclature carried into the array of legal proceedings that were brought under federal jurisdiction (criminal, civil, and bankruptcy) to address the consequences of the downfall.[2]

In the late summer and early fall of 2010, the Trustee commenced over 200 adversary proceedings in these cases. In almost all of them, he sought to avoid transfers of property that the Debtors had made to the defendants before the bank-

---

1. Over the objection of a group of creditors, the appointment was judicially approved. *See Ritchie Special Credit Invs., Ltd. v. U.S. Trustee*, 620 F.3d 847 (8th Cir.2010). All further references to "the Trustee" will signify Kelley, whether in his role as administrator of bankruptcy estates or as plaintiff in the litigation brought in these cases.

2. On December 2, 2009, Tom Petters was convicted of multiple counts of wire and mail fraud. The conviction has been affirmed by the Eighth Circuit. *United States v. Petters,* 663 F.3d 375 (8th Cir.2011), *cert. denied,* — U.S. —, 132 S.Ct. 2417, 182 L.Ed.2d 1024 (2012). Tom Petters is presently serving a 50–year sentence. The receivership continues to administer Tom Petters's personal assets. The bankruptcy cases include those in this group, as well as those jointly administered under *In re Polaroid Corp., et al,* BKY 08–46617. The *Polaroid Corp.* cases are now pending under Chapter 7 (post-conversion) and their estates are being administered by a different trustee.

ruptcy filings. He sought judgments for recovery of money to effectuate the avoidance. His requests for relief were framed under various legal theories, most prominently federal and state fraudulent-transfer statutes.

The commencement of this litigation was part of the Trustee's general strategy in the bankruptcy process: to rectify the de facto outcomes that otherwise would have resulted from the status quo as it lay when the Petters enterprise structure collapsed. Over a period of more than two decades, the Petters-controlled entities had made tens of thousands of transfers, almost all in the form of money, to a large number and variety of lenders, "investors," charitable donees, and other parties.

By the time of the bankruptcy filings, the status quo had three salient features. First, the debt structures in the bankruptcy cases included a much smaller number of late investors into the Petters operation, that were left unsatisfied on very large and late-created debt obligations. In the pre-bankruptcy operation of the debtor-entities, a much greater number of lenders and other creditor-participants had been repaid earlier. They had the benefit of earlier satisfaction of the debts owing to them. Finally, there was a huge, and sad, insolvency; by the time of the bankruptcy filings, very little money was left in the coffers of the business entities involved, and there were relatively few hard assets to show for all of the pre-petition activity.

This sort of litigation-undertaking by a receiver, trustee, or other appointed fiduciary is made to address the large imbalance between the positions of those who got out, versus those who were still in at the collapse. It bears the unfortunate name of "clawback" in lawyers' jargon and in media reportage. In the law, however, there is no specific, dedicated set of legal remedies to address the failure of a Ponzi scheme, as such. The inequities in a post-failure status quo seem obvious; but how to gauge and prioritize those inequities, and how to redress them, in a fashion that is procedurally regular, transparent, and substantively principled?

The federal processes of receivership, bankruptcy, and other court-supervised liquidation measures have been the resort taken, as the phenomenon of failed investment schemes has burgeoned in recent years.[3] Intuitively, this is appropriate given the baseline circumstance: the deep, fundamental insolvency of the persons and entities involved in the purveying, by the time of collapse. However, the progress of all such cases has been difficult. The reason is the patchy and incomplete match between the phenomenon at issue and the existing state of the law.

Ultimately, the shortfalls of existing statutory remedies highlight the deep underlying tensions in any legal response to failed, large-scale, and long-term fraudulent schemes.[4] The uncertainty is high-

---

**3.** These cases, the *Madoff* matter pending in the Southern District of New York, and the *Stanford* matter in Texas are only the three largest of dozens of cases commenced in the federal district and bankruptcy courts nationwide, in which the consequences of failed Ponzi schemes are being addressed at this time.

**4.** A recently-published handbook has a succinct observation on one of those tensions:

The black and white rules of decision that the law imposes to determine litigation winners and losers become challenging to apply in a Ponzi scheme case where allegations of bad faith can be made in any direction and virtually everyone can be accused of ignoring red flag warnings of wrongful conduct.

Kathy Bazoian Phelps and Steven Rhodes, *The Ponzi Book: A Legal Resource for Unraveling Ponzi Schemes*, § 1.02 at 1–5 (2012). *See also United States v. Dreier*, 682 F.Supp.2d

lighted by the subject matter of this memorandum: if, indeed, existing bankruptcy remedies are to be used to recapture ill-gotten gains earlier paid out, and all who transacted with a fraud are to be put onto a parity through the administration of an estate that is funded by recaptured as well as relict value, what should be recaptured and how far back should the process go?

It obviously cannot be a matter solely of "fairness," gauged subjectively and judicially imposed long after the fact. Our legal system is structured to protect seated property rights and to promote the reliance that underpins free commerce and the ready flow of capital. A deal is a deal, presumptively final as made; and transfers of property regular on their face are to be treated as final unless there is a specific basis, justified in established law, to disturb and reverse them.[5] Particularly when a recapture in "clawback" would ensnare unwitting recipients of past payment—those who transacted with the fraud's purveyor without knowledge of the wrongdoing—the need for definitive, principled, and limiting substantive rules is obvious. And yet there is that nagging point under it all: the money given to earlier recipients was likely mulcted from later-coming investors and lenders; so how "just" is it to allow earlier participants to keep the benefit of funds that had been "stolen" from others before they received them?

Limited as they are to the structures of preexisting general law, serving as they do the interests of a defined group of unpaid and unsatisfied creditors, those charged with unraveling failed Ponzi schemes have resorted to the existing law of fraudulent transfer and related creditors' remedies for the authority to recapture value from those who got clear of the purveyor before the downfall.

## THIS LITIGATION, AND ITS MANAGEMENT

The Trustee in these cases has done just that. The law of fraudulent transfer is the centerpiece theory of most of his "clawback" litigation. That structure comes with benefit for its invoker, but it is also subject to its original internal limitations. The exercise at bar is an effort to outline part of the extent and some of the limitations, against the incomplete state of the underlying law.

After the Trustee served complaints in the 200–odd adversary proceedings, he proposed a coordinated treatment of this large docket of litigation. He acknowledged that every proceeding had its own distinct facts. Tom Petters had transacted in a large variety of ways with a wide array of individuals, business entities, and organizations, through the vehicles of the debtor-entities. Nonetheless, as the Trustee correctly noted, there were several issues common to blocks of the adversary proceedings, that could be framed for broader rulings on the governing law. The issues would be purely ones of law— i.e., which interpretation of existing statute was the correct one, considering legislative history and intent to the extent it could be gleaned? Or, had the Trustee adequately pleaded the fundaments of his cases against the defendants?

Most of these issues could not be matched to definitive, on-point binding precedent from state or federal appellate courts. Much of the Trustee's theory of recovery had never been advanced in liti-

---

417, 418 (S.D.N.Y.2010) ("An under-appreciated evil of substantial frauds ... is how they pit their victims against one another.").

5. The presence of this precept in the backdrop of the law of debtor and creditor was pointedly recognized by the Minnesota Supreme Court over a century ago. *Brasie v. Minneapolis Brewing Co.*, 87 Minn. 456, 460–461, 92 N.W. 340, 341 (1902).

gation venued in Minnesota. Little of the theory had ever been ruled on by an appellate court, and there was no precedent from local appellate courts state or federal. Thus, were individual motions for dismissal to be treated proceeding-by-proceeding, it portended greater difficulty in maintaining consistency of outcome—and then a lengthy process of uncoordinated appeals.

So, the Trustee proposed to "consolidate" the presentation of issues that were common to the defense in large numbers of adversary proceedings, and that went either to the content of his pleading or to the applicable rule of decision as a matter of law alone. The vehicle for presentation would be motions for dismissal by defendants, under Rule 12(b)(6). To get the issues before the court, there would be a coordinated effort by the defense and a single consolidated response by the Trustee.

The proposal was aired via a "procedures motion" brought in the main bankruptcy cases. Numerous defendants gave their input. The court adopted the Trustee's proposal with some modifications. A "procedures order" then was entered [Dkt. No. 961] to identify these issues and to govern the coordination of briefing and argument on them in a semi-collective way. Separate rulings on particular issues were contemplated, to be memorialized in a general frame of reference and later applied to individual adversary proceedings via rulings on their specific fact-pleading. The court concluded that these broader rulings would be best set forth in one or more memoranda, styled in the main bankruptcy cases to make the best use of electronic means for general notice to the defense.

Oral argument was presented on three separate days, on discrete groups of issues for each day. This is the first memorandum on the parties' submissions. It is set down for the group of issues that is most involved, difficult, and portentous, for the largest number of defendants.

## INTRODUCTION TO FIRST MEMORANDUM

Under a careful analysis of the presentations, the issues posed under the broad rubric of "Statute of Limitations/Timeliness of Suit" are relevant for two different tasks in the treatment of the defendants' motions for dismissal. Rulings on the issues will also enable litigant-parties to position themselves against each other, for the actual disposition of motions for dismissal or for negotiation or mediation.

The first task breaks into several inquiries: to peg a specific minimum period, fixed by limitations principles and reaching back from a specific date, for which transfers by the Debtors to defendants are vulnerable to avoidance if fraudulent; to set the beginning date of the period; and to determine the availability and operation of tolling, a "discovery allowance," or other extension in time of defendants' vulnerability to suit. These are all abstract matters of finding or choosing a rule of decision; they do not turn on the individual circumstances of any specific adversary proceeding. Thus, the rulings on these issues do not require the consideration of actual fact-pleading, whether specific to any one complaint or the common fact-pleading used by the Trustee across the docket. The recent jurisprudence under Rule 12(b)(6)—*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); and their progeny—does not apply to this task.

After that, a second task is posed by the motions for dismissal, as they go to the timeliness of suit: to gauge the adequacy of the Trustee's fact pleading as to the discovery allowance, or any other extension of the limitations period as to trans-

fers that took place outside the base period, and to impose consequences for any inadequate pleading. In light of the present outcomes on the first task, this one will be deferred; it is better treated in the second memorandum with other issues over the content of the Trustee's pleading.

The sequence of analysis for the first task is best handled the way the parties organized their argument. They segregated the issues by their substantive nature and their sources in law. This breaks out into five defined issues. All of them center on the Trustee's ability to maintain suit against any particular defendant on transfers he impugns as fraudulent, via a complaint filed when he filed it and served when and as he did.

## ISSUE # 1: CHOICE OF STATUTE OF LIMITATIONS.

### Minn.Stat. § 541.05, Subd. 1(2) Versus Minn.Stat. § 541.05, Subd. 1(6): "Liability Created by Statute" Versus Action "on the Ground of Fraud."

This issue goes back to the basic conundrum, articulated in the introduction: just how far back in time and how broadly might a clawback effort sweep, when it is substantively premised on the law of fraudulent transfer? The controversy here arises from the Trustee's invocation of Minnesota state law, under the empowerment of 11 U.S.C. § 544(b).[6] The Trustee has used § 544(b) and the Minnesota enactment of the Uniform Fraudulent Transfer Act, Minn.Stat. §§ 513.41–513.51 ("MUFTA"), in most of his clawback litigation. Through those substantive vehicles, he seeks to reach transfers made by the Debtors during an extended period of time *before* the two-year window of vulnerability to avoidance under 11 U.S.C. § 548.[7]

MUFTA's text does not contain its own statute of limitations, i.e., one specifically applicable to actions brought under MUFTA.[8] Thus, the statute of limitations must be gleaned from general Minnesota law. As framed by the parties, the question is, which of two alternatives is to apply to the Trustee's claims under MUFTA?

The first choice is Minn.Stat. § 541.05, Subd. 1(2), which provides for a six-year

6. Section 544(b) empowers a trustee to "avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable" in a bankruptcy case under 11 U.S.C. § 502. In application, this enables the trustee to invoke the state substantive law of fraudulent transfer, if an unsecured creditor could have used it outside of bankruptcy to challenge its debtor's transfers of assets. *E.g., In re Marlar*, 267 F.3d 749, 755–756 (8th Cir.2001); *In re Popkin & Stern*, 223 F.3d 764, 769 n. 11 (8th Cir.2000); *In re Estate of Graven*, 64 F.3d 453, 456 n. 5 (8th Cir.1995); *In re Graven*, 936 F.2d 378, 383 n. 7 (8th Cir.1991); *In re DLC, Ltd.*, 295 B.R. 593, 601 (8th Cir. BAP 2003).

7. Section 548 is the Bankruptcy Code's separate fraudulent-transfer provision. It subjects to avoidance "any transfer ... of an interest of the debtor in property, ... that was made ... within 2 years before the date of the filing of the [bankruptcy] petition...." 11 U.S.C. § 548(a)(1). MUFTA does not have cognate language. The Trustee invoked § 548 in various proceedings in this litigation, as was open to him; but his primary reliance is on MUFTA, not the least because it could enable a far larger aggregate recovery for the benefit of the Debtors' creditors.

8. The original proposed text of the Uniform Fraudulent Transfer Act had a statute of limitations provision at its § 9, with a four-year limitations period for both actual and constructive fraud claims and a discovery-dependent tolling for up to one year for actual-fraud claims. *See* 7A Uniform Laws Annotated B Pt. II at 4–5 (2006). (The ULA issuance of the text will be signified "UFTA" after this.) Minnesota may be the only state that excised this whole provision without an express sub-

limitations period "upon a liability created by statute." The other is Minn.Stat. § 541.05, Subd. 1(6). It imposes a six-year limitations period for actions for relief "on the ground of fraud"; but it further provides that "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."

In application, then, there is the same basic six-year window for the commencement of suit. However, for actions subject to Subd. 1(6), the limitations period does not start on the event of fraud, but rather upon its "discovery by the aggrieved party." *Kopperud v. Agers*, 312 N.W.2d 443, 446–447 (Minn.1981). (This interim period is sometimes called the "discovery allowance" in the case law.)

The defendants collectively [9] argue that Subd. 1(2) applies to the Trustee's claims under MUFTA. The Trustee argues that Subd. 1(6) applies; and, as he would have it, the historical circumstances of Tom Petters's operation of his Ponzi scheme support an extended reach for his avoidance

powers via the "discovery allowance." In the alternative, the Trustee argues that he has the benefit of judicially-recognized equitable tolling of the six-year statute of limitations, even if Subd. 1(2) applies (with its lack of a facial "discovery allowance" period).

The choice between the two is important to both sides. If Subd. 1(2) applies, the Trustee's avoidance power reaches transfers that occurred within the six years that preceded the relevant date from which the limitations period reaches back.[10] If some form of judicially-created tolling is not available to the Trustee, his avoidance power reaches no further back than that six-year point. If Subd. 1(6) applies, transfers made by the Debtors much earlier than the statutory six-year period might be subject to avoidance—depending on who, or what the "aggrieved party" is deemed to be, in the alignment of parties in this litigation and given the source and operation of the Trustee's statutory empowerment as plaintiff.

---

stitute, when it enacted the UFTA in 1987. 1987 Minn. Laws, Ch. 19, S.F. No. 97, § 9 (enacting Minn.Stat. § 513.50).

**9.** The project at bar originally implicated nearly 260 adversary proceedings. Around 170 of them remain pending after an interim round of mediation successfully facilitated by the late Judge Nancy C. Dreher, plus some settlements or dismissals. The remainder of the initial thrust for dismissal comes out of dozens of motions for dismissal filed separately in remaining adversary proceedings. These movant-defendants have interests and exposure that vary hugely. (One illustration of this variance is the lists of issues grouped by the defendants that raise each category, that the Trustee presented in 16 charts in an appendix to his Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss [Dkt. No. 1158] (*"Trustee's Omnibus Memorandum"*) at CM/ECF pp. 151–179.) For this "consolidated issues" treatment, the division of labor among the defendants took a

predictable path. Longer, more comprehensive (and higher-quality) briefing was submitted by a limited number of defendants, generally those sued for far larger sums or whose dealings with the Petters organization had been more complicated. Other defendants joined pro forma in the argument made by the heavy lifters, or raised issues of narrower scope or smaller import. For the sake of brevity, further references to the arguments from the Trustee's opposition will be attributed to "the defense," even though the large issues submitted for decision were actually analyzed and carried by a limited number of defendants that had high-quality representation by counsel. Their identities are clear from the record, but it would be too cumbersome to give individualized credit split among the many component arguments.

**10.** The fixing of that relevant start-date was an issue under some of the motions for dismissal. It is treated under Issue # 2 of this memorandum, *infra* at pp. 31–39.

In the most practical sense, the outcomes on these issues could control whether some defendants could be liable to the estates at all; and it could set the outside exposure of other defendants that had longer and more sustained transactional relationships with the Debtors. Conversely, it would either limit or expand the estates' maximum possible recoveries from the clawback. Ultimately, the ruling would affect the size of the pot of recovered funds from which creditors' readjusted rights would be serviced, after the full task of recapture via avoidance was completed.

Neither the Minnesota Supreme Court nor the Minnesota Court of Appeals has ruled on the basic, but specific, issue—the choice between the two subdivisions in the context of an action under MUFTA.[11] There is some guidance from those courts in case law that identifies more general considerations to distinguish an action over "a liability created by statute," from an action for relief "on the ground of fraud." Under these authorities, the issue turns on the origin, descent, and resultant nature of the remedy under the governing substantive law—i.e., whether in (or in the identifiable nature of) the common law of fraud, or in legislative enactment that goes beyond that common law in its scope, nature, and application. The inquiry here is historical in orientation—or, perhaps more accurately, genealogical.

The thrust of the defense's argument on Issue #1 is that Subd. 1(2) applies because the Trustee relies on MUFTA, a statute, as his substantive basis for seeking a judgment of avoidance and recovery against them. The defense does not deny that the Trustee's claims "sound in" fraud, in the sense that resort to fraudulent-transfer remedies generally calls to mind a notion of deception akin to that traditionally contemplated under the common law of fraud. But despite that connotative resonance, the defense insists that the application of Subd. 1(2) is compelled by the very origin of the governing law in a legislative enactment, and nothing more. The defense says it is this simple: the Trustee invokes a specific statute to provide the rules of decision on his requests for relief; he seeks the remedies provided in that statute; and therefore any resultant liability in any of the defendants is "created by statute."

In support, the defense cites *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917 (8th Cir.2004). In *Tuttle*, the court held that Subd. 1(2), with its strict-accrual approach, provided the statute of limitations for actions under the Minnesota Prevention of Consumer Fraud Act ("MPCFA"), the Minnesota Unlawful Trade Practices Act ("MUTPA"), and the Minnesota False Statement in Advertising Act ("MFSAA"). The defendants also cite a string of decisions from the United States District Court, in which Subd. 1(2) was held to apply to actions under the same statutes, plus other Minnesota legislation that provides remedies for conduct in commerce (the sale of goods) that involves deception. *E.g., Moua v. Jani–King of Minnesota, Inc.*, 613 F.Supp.2d 1103, 1113–1114 (D.Minn.2009); *Buetow v. A.L.S. Enters.,*

---

11. In a handful of published decisions, the local bankruptcy forums have stated that Subd. 1(6) applied to a trustee's fraudulent transfer-action under Minnesota law. However, all these statements were extraneous dicta. *In re Grimlie*, 439 B.R. 710, 720 n. 25 (8th Cir. BAP 2010); *In re Quality Pontiac Buick GMC Truck, Inc.*, 222 B.R. 865, 869 n. 6 (Bankr.D.Minn.1998); *In re Curry*, 160 B.R. 813, 819 n. 5 (Bankr.D.Minn.1993). *See also In re Strom*, 97 B.R. 532, 540 (Bankr.D.Minn. 1989). No member of the local bankruptcy bench has ever issued a published decision that treated the issue of which subdivision applied, between 1(2) and 1(6).

*Inc.*, 259 F.R.D. 187, 193 (D.Minn.2009); *Klehr v. A.O. Smith Corp.*, 875 F.Supp. 1342, 1352–1353 (D.Minn.1995); *Veldhuizen v. A.O. Smith Corp.*, 839 F.Supp. 669, 676–677 (D.Minn.1993).

The Trustee is correct, that the discussion in these earlier decisions does not expressly pit Subd. 1(2) against Subd. 1(6), as the source for a statute of limitations. However, at least some of these courts note that a "discovery allowance" was available under some statutes of limitation other than Subd. 1(2), and they considered these alternatives for their applicability where argued. Thus the judicial task in these cases had some semblance to the one at bar. All of these courts held that the plaintiffs' specific statutory causes of action accrued on the date of the purchase of the goods or products at issue, for the statutory limitation on the action. Thus, under these rulings, the limitations periods were to expire six years after the date of that purchase—regardless of when the plaintiffs actually discovered the alleged deception in the conduct of their opposing parties. *Tuttle*, 377 F.3d at 926; *Moua*, 613 F.Supp.2d at 1114; *Klehr*, 875 F.Supp. at 1352–1353; *Veldhuizen*, 839 F.Supp. at 676.

To counter such an outcome, the Trustee uses the analysis from a different line of authority, one from the Minnesota appellate courts. As he would have it, the mere source-point of his remedies in the legislative enactment of MUFTA in 1987 is not the telling aspect. Rather, he maintains, the deeper historical origin of fraudulent-conveyance remedies, in the received common law of Minnesota, mark them as "on the ground of fraud" in a pre-statutory sense. Hence, the Trustee argues, Subd. 1(6) must apply, with its extender for a discovery allowance.

■ The Trustee argues that this approach is well-founded in Minnesota prece-dent, specifically *McDaniel v. United Hardware Distrib. Co.*, 469 N.W.2d 84 (Minn.1991). *McDaniel* was an action for damages, brought pursuant to Minn.Stat. § 176.82 on a claim of wrongful discharge from employment in retaliation for seeking workers' compensation benefits. In it, the Minnesota Supreme Court had to determine whether the action was subject to the six-year statute of limitations of Subd. 1(2), or to shorter limitations periods provided for claims for nonpayment of wages made under law other than Minn.Stat. § 176.82. The *McDaniel* court stated that "[Subd. 1(2) ] applies to liabilities *imposed by* statute, not to liabilities existing in common law which have been *recognized by* statute." 469 N.W.2d at 85 (emphasis added). This holding is the touchstone of the Trustee's analysis.

Citing historical antecedents of Minnesota fraudulent-conveyance law back to earlier statehood and before, the Trustee argues that MUFTA descends directly from traditional common-law authority that countenanced the avoidance remedy and the imposition of liability on transferees. In the Trustee's view, MUFTA only continued a statutory "recognition" of this far-earlier and equally-broad liability "existing at common law"; and because the original common-law claim and the statutory form are both premised on fraud committed by the transferor, any action for avoidance is a suit "on the ground of fraud." Thus, as the Trustee would have it, his claims are subject to Subd. 1(6) for their limitations, including that statute's discovery allowance.

The Trustee's theory is linear in its relative simplicity. His opponents raise a welter of arguments against it.

One strong defense theme is the insinuation that *McDaniel's* quoted distinction is only dicta. Beyond that, *McDaniel* is im-

pugned as a sport or anomaly in case law, not applied to significant analytic effect in two decades' worth of subsequent judicial development.[12]

■ The insinuation is wrong. Even though *McDaniel* did not involve the issue at bar, the choice between Subd. 1(2) and Subd. 1(6), the case did require the components of a set of claims in suit to be categorized between Subd. 1(2) and other statutory limitations provisions that govern claims substantively arising under common law.[13] And the opinion did trace the historical origin of the right of action before it, concluding that the Minnesota legislature had *created* the cause of action (under Minn.Stat. § 176.82, a claim for damages for retaliatory discharge from employment) over a decade *before* the Minnesota Supreme Court had recognized a broader-ranging "common law action for retaliatory discharge in violation of public policy." 469 N.W.2d at 85.[14]

Thus, the cause of action in *McDaniel* was definitely "created by statute"; it had no antecedent expressly articulated in the common law and there had been no right to sue for the specific wrong before the enactment. Because the nature of the alleged wrong was factually distinctive and the statutory framework was enacted to address such facts, the suit could not be likened to a common law action for lost wages that would be subject to a different (and shorter) statute of limitations (under Minn.Stat. § 541.07). 469 N.W.2d at 86.[15]

To be sure, the legal backdrop to *McDaniel* did not feature a discovery allowance or other durational override of an otherwise-fixed time to commence suit. Nonetheless, the case did require a *distinction* to be drawn between claims derived from different sources of law for which comparable measures of damages could be sought. It then required a determination whether the legal basis for those claims originated in legislative action or judicially-enunciated common law. As such, *McDaniel's* cleaving line is *not* extraneous to that case's outcome. It definitely

12. *E.g.*, General Electric Capital Corporation's Reply Memorandum in Support of Motion for Dismissal [ADV 10–4418, Dkt. No. 15], 3–6.

13. The *McDaniel* court had to make that categorization because the alternate statute of limitations urged by the defendant there, for liabilities "arising upon a penalty or forfeiture or where a shorter period is provided by section 541.07," was expressly excepted in the text of Subd. 1(2). *McDaniel* did not require a choice between two competing subdivisions within Minn.Stat. § 541.05, as is required here.

14. The defense's other snipe against *McDaniel* is only rhetorical. To be sure, *McDaniel* has been cited for the relevant pronouncement in only three published decisions since its issuance. In one, it was held irrelevant as to a claim for breach of contract pleaded under common law. *Burns v. Kraft Foods N. Am., Inc.*, 2004 WL 2283548, *2 (D.Minn.2004). In the other two, its analysis was applied to

relegate sued claims to the governance of Subd. 1(2) or to a court trial, because the liabilities had been created by statute and had no antecedents in common law. *Manteuffel v. City of N. St. Paul*, 570 N.W.2d 807, 812 (Minn.Ct.App.1997); *Snesrud v. Instant Web, Inc.*, 484 N.W.2d 423, 427 (Minn.Ct.App. 1992). Admittedly, that is not much in citation; but so what? A paucity of later citation only speaks to happenstance, i.e., how frequently corollary issues make their way through the appellate system. It says nothing about whether a ruling was or is good law.

15. And the choice between the two statutes of limitation was not without consequence. In holding that Subd. 1(2) applied, the Minnesota Supreme Court affirmed the Minnesota Court of Appeals. The intermediate appellate court had reversed the trial court's ruling that the shorter statute of limitations, for claims for lost wages framed under the common law, applied to the action. That ruling would have cut off a portion of the damages claimed by the plaintiff. 469 N.W.2d at 84, 87.

is not to be dismissed as dicta. To opposite effect, it does offer a neutral principle through which to analyze the conundrum presented here, the classification of MUFTA from its origin and nature, to place it for limitations purposes under Subd. 1(2) or under Subd. 1(6).

The Trustee relies on *McDaniel* to take his fraudulent transfer claims from the governance of Subd. 1(2). His theory is that these remedies "exist[ed] at common law" in Minnesota from early statehood; that the first enactments of fraudulent conveyance legislation only "recognized [the remedies] by statute"; and that the essence of the remedies remained the same through the enactment of MUFTA, the current law, in 1987. Thus, he insists, the line of descent makes his avoidance claims "on the ground of fraud," subjecting the limitations period to extension under the statutory discovery allowance.[16]

Certain parts of this genealogy are established beyond dispute. A creditor's remedy against fraudulent conveyance was present in the law of early-modern England, recognized judicially and also embodied in the statute of 13 Elizabeth Ch. 5. *E.g., Orr v. Kinderhill Corp.,* 991 F.2d 31, 34 (2d Cir.1993) (pointing to recognition of fraudulent conveyance principles in *Twyne's Case,* 76 Eng.Rep. 809 (Star Chamber 1601)). *See also Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 43, 109 S.Ct. 2782, 2790–2791, 106 L.Ed.2d 26 (1989) (recognizing that "actions to recover

... fraudulent transfers were often brought at law in late 18th-century England"). The notion of fraudulent conveyance and the structure of a remedy against it were received into the judicially-enunciated law of Minnesota very early. Significantly, that receipt was articulated as an adoption of *common law. E.g., Byrnes v. Volz,* 53 Minn. 110, 54 N.W. 942, 943 (1893); *Benton v. Snyder,* 22 Minn. 247, 1875 WL 3901, *1 (1875); *Blackman v. Wheaton,* 13 Minn. 326, 331, 1868 WL 1903, at *3.

As well, early Minnesota legislatures enacted statutory provisions to govern the remedy for fraudulent conveyance. *Gere v. Murray,* 6 Minn. 305, 1861 WL 1869, *3 (1861). Even later in the 19th century, the Minnesota Supreme Court recognized that the remedy under adopted common law had continuing vitality itself, even as the court cited the local fraudulent-conveyance legislation in its rulings in the same opinion. *Byrnes v. Volz,* 54 N.W. at 943; *Blackman v. Wheaton,* 13 Minn. at 330–331, 1868 WL 1903, at *3.

And directly to the point of the Trustee's *McDaniel*-structured analysis, the Minnesota Supreme Court expressly characterized these early local statutes as "but declaratory of the common law," just as the original statute of Elizabeth had been. *Blackman v. Wheaton,* 13 Minn. at 330–331, 1868 WL 1903, at *3; *Byrnes v. Volz,*

---

**16.** There is an unspoken predicate for the very first generation within this descent: a traditional action to attack a fraudulent conveyance was "on the ground of fraud," as fraud is conceived in the common law. None of the defendants has challenged this foundational postulate. That is just as well. Minnesota law very early recognized the *Ur*-legislation on fraudulent conveyance, the statute of 13 Elizabeth Ch. 5, as "declaratory of the common law" as it existed in England before that enactment. *Blackman v. Wheaton,* 13

Minn. 326, 1868 WL 1903, *3 (1868) (citing mid–19th century treatises on equity and fraudulent conveyances, plus United States Supreme Court opinions). And, there is no distinction to be found in early Minnesota case law between the "fraudulent intent" that "render[ed] void certain conveyances made with" that intent, *id.,* and the specific intent to harm by deception that was an essential element of a common-law fraud action in which damages were sought.

53 Minn. at 115, 54 N.W. at 943.[17]

The defense does not deny this analysis, to the extent it speaks to the first and earliest Minnesota fraudulent-conveyance legislation. The attack on the Trustee's theory goes to the categorization of *current* law, MUFTA, the actual basis of the Trustee's suit. The defense's position is straightforward: even if Minnesota's original fraudulent conveyance statute had abstract coincidence to a claim for fraud under the common law, an ensuing 150 years of legislative amendment, repeal, and enactment have altered and expanded the law of fraudulent transfer in Minnesota— so greatly that the current variant, in its indivisible whole, gives rise to "liability created via statute" and nothing else.

But is this so, that the governing law is the product of such a sea-change?

The Trustee strenuously denies that, but he does so in a fairly conclusory way. He cites the holding of the Minnesota Supreme Court that the predecessor of Subd. 1(6) applied to the pre-UFCA statute, *Brasie v. Minneapolis Brewing Co.*, 87 Minn. at 461–463, 92 N.W. at 342. He then quotes a later observation that the text of Minnesota's 1921 adoption of the UFCA was a "codification and an extension of our former law," *Lind v. O.N. Johnson Co.*, 204 Minn. 30, 282 N.W. 661, 666 (1938). And then he quotes the statement of the drafters of the original model law,[18] that the "basic structure and approach of" the UFCA, itself "a codification of the 'better decisions' applying the statute of 13 Elizabeth," were preserved in the text of the Uniform Fraudulent Transfer Act as first released in 1984. 7A Uniform Laws Annotated B Pt. II at 4–5 (2006). Thus, the Trustee summarily characterizes MUFTA as "a codification of [the] common law" of fraudulent conveyance, making its relief "on the ground of fraud" and hence subject to Subd. 1(6).

As the defendants' various arguments show, it is neither as easily done nor as blithely said as that. Nonetheless, once the defendants' points are parsed through, the outcome urged by the Trustee is the better-supported one. Over the course of Minnesota's statehood, the facial and midlevel accretions to the substance of the statute of 13 Elizabeth did not enlarge the true scope of the remedy. Nor did they materially alter the proof required to get it. Current fraudulent transfer law in Minnesota remains in essence as a conduit of relief to creditors who otherwise would be mulcted out of their possible recovery, by their debtors' acts to hide or remove assets from the creditors' collection remedies. The remedy has been recast, reorganized, and limned in a modified vocabulary by two major replacements of statutory

---

17. In their briefing, some of the defendants deny that Minnesota had a fraudulent conveyance statute before the enactment of the Uniform Fraudulent Conveyance Act in 1921. *E.g.*, Memorandum in Support of Employee–Defendant David Baer's Motion to Dismiss the Trustee's Adversary Complaint [ADV 10–4370, Dkt. No. 12], 37. This is simply wrong. Minnesota's Territorial Statutes of 1851, at Ch. 64, copied New York's 1829 fraudulent conveyance statute "almost verbatim." Donald E. Bridgman, *Uniform Fraudulent Conveyance Act in Minnesota*, 7 Minn. L.Rev. 453, 456 n. 10 (1922); *Gere*, 6 Minn. 305, 1861 WL 1869 at *3 (noting "[t]he history of this statute, copied as it is from New York, is well known"). The first post-statehood codification reenacted the same statute. Minn.Stat. Ch. 51, §§ 1, 4 (1858). The recodifications of the Minnesota statutes for the next 55 years had fraudulent conveyance provisions. Minn. Stat. Ch. 41, § 18 (1863 and 1866); Minn. Stat. Ch. 41, § 4222 (1894); Minn.Stat. Ch. 68, § 7013 (1913).

18. That is, the National Conference of Commissioners on Uniform State Law, through its Special Committee on Uniform Fraudulent Transfer Act.

text. But the relief more broadly available to creditors has not changed, in its outer boundaries, its prerequisites of proof, or its ultimate result. It still redresses concealed—and hence deceptive—acts of debtors, just as the traditional remedy—sprung out of the common law's redress for fraud—did in its day.

The defendants compared various aspects of the several statutes, to challenge the Trustee's theory of continuity. Other points to address appear from a deeper reading of the law's genealogy.

The first can be recognized right away as unequivocal support for the Trustee's theory. The first post-statehood fraudulent conveyance statute in Minnesota mirrored the New York statute in covering "[e]very conveyance or assignment ... of any estate or interest in lands, or of goods, chattels, or things in action." However, an 1863 amendment removed outright transfers of personalty (i.e., those not made into a trust) from its coverage. *Compare* Minn.Stat. Ch. 41, § 18 (1858) *with* Minn. Stat. Ch. 41, § 18 (1863) (the latter lacking the phrase "goods, chattels, and things in action" as potential subjects of a fraudulent transfer). Between 1863 and the 1921 adoption of the UFCA, fraudulent transfers of personalty were still subject to challenge, under the preexisting common law rule. *Byrnes v. Volz*, 53 Minn. at 114–115, 54 N.W. at 943.

The UFCA, by a provision codified locally at enactment at former Minn.Stat. Ch. 68, § 8467 (1923), brought fraudulent transfers of personalty (identified there as "goods and chattels") back under statutory governance. They remain there under MUFTA. *See* Minn.Stat. § 513.41(2) (defining "asset"-subject of challenged transfer, as "property of a debtor," without

distinction between realty and personalty). Thus, if anything, the respective enactments of the UFCA and MUFTA actually reconform the scope of fraudulent transfer remedies under modern statute to the originals under the common law. This makes out one (temporarily interrupted) continuity in the line of descent through statute, to support the genealogy posited by the Trustee.[19]

For their part, the defendants emphasize four other, salient aspects of Minnesota's modern, post–1921 fraudulent transfer law. They characterize these provisions as large discontinuities. As they would have it, these provisions so expanded the nature and scope of preexisting law as to fully supplant the historical original. This would make "liability" under MUFTA "created by statute" and hence governed by Subd. 1(2).

The second of these alleged departures (the one most emphasized by the defendants) is the grant of remedies under the UFCA and MUFTA to "general" unsecured creditors, i.e., those that do not have judgments against transferor-debtors.

It is true that, before the UFCA's enactment, Minnesota fraudulent conveyance law required a creditor to reduce its claim to judgment before it could seek to have a transfer of property by its judgment debtor set aside as fraudulent. *Brasie v. Minneapolis Brewing Co.*, 87 Minn. at 460, 92 N.W. at 341 (describing three procedures to have fraudulent conveyance set aside, all of them requiring creditor to have received judgment against transferor-debtor); *Wadsworth v. Schisselbaur*, 32 Minn. 84, 19 N.W. 390, 391 (1884) (requiring creditor to have obtained post-judgment lien, via levy on personalty or docketing of

---

**19.** Even after the legislature's adoption of the UFCA, the Minnesota Supreme Court opined that "the common-law rule remains in force," as to the setting-aside of fraudulent transfers of personalty. *Murphy v. Casey,* 157 Minn. 1, 195 N.W. 627, 629 (1923).

judgment in county of real estate's location, as prerequisite to fraudulent conveyance action); *Gorton v. Massey,* 12 Minn. 145, 1866 WL 4752, *2 (1866) ("A fraudulent conveyance, so far as creditors are concerned, can be avoided by them, only after they have obtained judgment".). *See also In re Michener,* 217 B.R. 263, 268 (Bankr.D.Minn.1998). *But see Case v. Beauregard,* 101 U.S. 688, 690, 25 L.Ed. 1004 (1879) (observing, as matter of equity jurisprudence, that obtaining judgment against transferees may not be necessary as prerequisite to fraudulent-conveyance action, if transferees are insolvent and execution would invariably be retained unsatisfied).[20]

It is also true that the UFCA eliminated this prerequisite. Via its definition of "creditor," it allowed "a person having any claim [against a transferor], whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent" to bring action to set aside a fraudulent conveyance. Minn.Stat. Ch. 68, § 8475 (1923). *See also* Minn.Stat. Ch. 68, §§ 8483–8484 (1923) (granting rights of action to creditors with matured and unmatured claims). Finally, on its enactment in 1987 MUFTA carried forward the UFCA's broader grant of statutory standing for the remedy. Minn.Stat. §§ 513.41(4) (" 'Creditor' means a person who has a claim.") and (3) (" 'Claim' means a right to payment, whether or not the right is reduced to judgment....").

As the defendants would have it, the 1921 statutory change "extend[ed] the right to bring a preexisting common law cause of action to a new set of plaintiffs," making it something created by statute

that went far beyond any mere codification of the common law. GECC's Reply Memo, 9 (citing *Aetna Life and Cas. Co. v. Nelson,* 67 N.Y.2d 169, 501 N.Y.S.2d 313, 492 N.E.2d 386, 389 (1986) for a proposition that "where statute afforded new category of plaintiffs ... right to sue" on preexisting cause of action, it was "not a mere codification" of the common law that previously governed).

This argument is not viable. Yes, the 1921 legislation was recognized generally as "an extension of former law." *Lind v. O.N. Johnson Co.,* 282 N.W. at 667. However, this facial change was not an extension in substance. The change was defined solely in terms of the affected party's *procedural posture* in a process of civil litigation. There was no change in the substantive qualification for membership in the simply-defined, *general* class of parties that had long been protected by the overall legal regime of fraudulent conveyance—which is to say, the creditors of a fraudulently-conveying debtor, those that claimed an extrinsic right to payment from the debtor. This provision did not change the *substantive* requirements to obtain the relief. It only "add[ed] an efficient, optional, and additional remedy" for a creditor that had not yet taken the *procedural* expedient of suing through to judgment—"a simple creditor," yes, but a *creditor* nonetheless. *Id.See also* Bridgman, *UFCA in Minnesota,* 7 Minn. L.Rev. at 541 (characterizing deletion of prior requirement of judgment as a "change of procedure which reduces the delay," "sav[ing] great delay and circuity of action," by allowing creditor to use single action to sue debtor for judgment on debt

---

**20.** And, even Minnesota law is not entirely strict or fully consistent on the prerequisite of judgment. *See Citizens' State Bank of Tracy v. Brown,* 110 Minn. 176, 124 N.W. 990, 992 (1910) (grant of chattel mortgage may be ad-

judged fraudulent as to creditors that had claims against transferor while chattels were in possession of mortgagor, even where creditors did not obtain judgment until after mortgagee took possession).

and transferee for judgment setting aside conveyance).

If one considers the "relief" in question (to use the terminology of Subd. 1(6)), there is no difference—the remedy as a whole was created long ago to redress a wrong to creditors generally.[21] To the same effect, and under the same legislative purpose, the "liability" in the sense of Subd. 1(2) is the same as the UFCA and MUFTA was under earlier law. *See Orr v. Kinderhill Corp.*, 991 F.2d at 33 (under New York law, to fall under statute of limitations for liabilities under statute, "the statutory liability must truly be new"; it is not sufficient if legislative enactment "merely enlarges the common-law scheme of liability or grants additional remedies").[22]

The direct ancestry of MUFTA in the common law of fraud, then, is not sundered by the UFCA's facial abrogation of a procedural prerequisite for suit.

Third, the defense asserts that "the UFCA established a cause of action for constructive fraudulent transfer for the first time in Minnesota," as a decisive break from the common law into exclusive governance by statute. GECC's Reply Memorandum, 9.

A constructively-fraudulent transfer is proven without evidence of the transferor's actual intent, where a debtor, then-insolvent or to be rendered insolvent, did not receive value commensurate to the value of the asset transferred. Under current law, this is provided by Minn.Stat. § 513.44(a)(2). That statute provides in pertinent part:

> (a) A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> . . . .
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

---

**21.** And this thought is valid whether one considers the "relief" as *in rem*—as to the transferred property—or *in personam*—as to the transferee.

**22.** This contrasts with the issue presented in *Aetna Life and Cas. Co. v. Nelson*, the main authority cited by the defense. That case involved a provision of New York's no-fault insurance law that gave a no-fault insurer a lien on any recovery that its insured received from a third-party tortfeasor, to secure its right to recoupment on account of its past no-fault payment to its insured for losses of a nature that were also legally encompassed by the damages paid by the third party. The only question on appeal was whether New York's shorter statute of limitations on "liabilities created or imposed by statute" applied to an action by the insurer against its insured in which redress was sought for the insured's dissipation of the funds paid by the third party. 501 N.Y.S.2d 313, 492 N.E.2d at 387. In holding that it did, the New York Supreme Court held that the shorter limitations provision "only governs liabilities which would not exist but for a statute." 501 N.Y.S.2d 313, 492 N.E.2d at 388. It concluded that the creation in the no-fault law of a comprehensive structure of "new and independent statutory rights and obligations," completely distinct from the common-law system of reparations for personal injuries, meant that the insurer's lien and attendant rights and liabilities "do[] not codify common-law principles." 501 N.Y.S.2d 313, 492 N.E.2d at 389. As a result, the longer, general statute of limitations did not apply. Here, by contrast, the central bulk of legal governance over the fraudulent-conveyance remedy, including all its core concepts of the liability of a transferee or transferred assets, were fully a feature of Minnesota law before the enactment of the UFCA. The deletion of the requirement of judgment only reduced the burden of the pre-existing protected class of parties so the central issues could be addressed earlier and the availability of effective relief was enhanced.

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

The defense acknowledges that the UFCA included a predecessor-provision, Minn. Stat. Ch. 68, §§ 8478, 8780 (1923). But, it insists, law preexisting the UFCA did not contemplate the remedy being available on anything other than hard proof of the debtor-transferor's actual intent to hinder, delay, or defraud creditors.

This argument is correct, in a purely abstract sense that goes to *statutory structure and syntax*. However, it ignores a strong continuity in the legal substance that actually controlled the remedy, under the Minnesota Supreme Court's construction of prior statute and the original common law.

Following its New York antecedents, pre-UFCA statute in Minnesota did contain a facial requirement of actual intent to defraud. Minn.Stat. Ch. 51, § 4 (1858) (fraudulent intent is question of fact that cannot be adjudged solely on proof of lack of valuable consideration); Minn.Stat. Ch. 68, § 7015 (1913) (same). *See also* Bridgman, *UFCA in Minnesota,* 7 Minn. L.Rev. at 530 (before promulgation of UFCA, small number of states statutorily recognized fraudulent conveyance on articulated constructive-fraud theory that expressly did not require proof of intent; but that was never the rule under Minnesota's statutes).

However, in recognition of the invariable difficulties of proving actual intent by direct evidence, the Minnesota courts recognized a *presumption* of fraudulence as to existing creditors, where a debtor conveyed without receiving consideration and either was insolvent or did not retain property sufficient to pay his existing debts. *E.g., Underleak v. Scott,* 117 Minn. 136, 134 N.W. 731 (1912); *Thysell v. McDonald,* 134 Minn. 400, 159 N.W. 958, 960 (1916).[23] This was expressed as a measure applied in the judicial treatment of proof for the intent element, rather than an articulation of an independent substantive requirement. Nonetheless, it is clear that Minnesota law countenanced an adjudication of liability for fraudulent conveyance on the very same factual considerations later embodied in the UFCA, were the presumption not rebutted.

And, in at least two early opinions the Minnesota Supreme Court considered the presumption to be difficult to rebut, at least when triggered on certain combinations of proof. *Henry v. Hinman,* 25 Minn. 199, 1878 WL 3585, *2 (1878) (debtor's transfer of all assets to relative for nominal sum and promise of future support "is, in the absence of proof of other property left to satisfy creditors, a clear prima-facie case of an intent to defraud creditors—one which requires strong evidence to overcome"); *Truitt Bros. & Co. v. Caldwell,* 3 Minn. 364, 1859 WL 3104, *7 (1859) ("an assignment of an insolvent debtor, providing for a resulting interest to the assignor, without paying all the creditors, is of itself evidence of" actual fraudulent intent, due to "[t]he legal effect of

---

23. In conjunction with this rule, it was required that the property transferred "be of value, out of which the creditor could have realized the whole or a part of his claim, or otherwise expressed property which is appropriate by law to the payment of the debt." *Blake v. Boisjoli,* 51 Minn. 296, 53 N.W. 637 (1892).

such a conveyance being necessarily to hinder, delay, and defraud, creditors, the intent to do this must be presumed by the court, and there is no question to submit to the jury").

The same principles, then, were placed into a facially-separate basis for liability under a successor statute. This probably stemmed from the same functional considerations of proof and judicature. The codification of constructive-fraud theory served in the main to impose a uniform, objectively-articulated standard, to remedy prior inconsistencies in the judicial framing of the presumption. Bridgman, *UFCA in Minnesota*, 7 Minn. L.Rev. at 530 ("the decisions [were] in some confusion because the rule of presumptive fraud [was] not stated in all cases the same...."). The legislation "introduced certainty in the matter," because it "stated the rule [under *Underleak* and other preexisting case law] without requiring a stretching of judicial construction." *Id. See also Nat'l Surety Co. v. Wittich*, 184 Minn. 44, 237 N.W. 690, 692 (1931) (comparing UFCA provision in application, to rule of *Underleak* and other decisions).

As to a constructively-fraudulent conveyance, then, the UFCA had a near-wholesale transplantation of the basic substance of liability from prior judicial construction of early statute and preexisting common law. This was not a fresh legislative grant of rights of action to a wholly new class of parties, who had not been protected under the common law. The change did not "create" something "truly new."[24]

The replacement of the UFCA by MUFTA made a few alterations to the sense of a constructively-fraudulent transfer, but they are not material to the analysis between Subds. 1(2) and 1(6).[25] Not a one of these changes alters the outlines of the classes protected by or vulnerable to the remedy. Nor do they recognize a different harm to be redressed. They make nothing "created by statute" that had not been inherent in the antecedents that had been descended from common law themselves. So, on the whole, there is no discontinuity on this point of the current law, MUFTA, that makes the Trustee's claims on theories of constructive fraud "created by statute."

24. Yes, the codification of constructive fraudulence in the UFCA is that it took away a practical avenue of defense otherwise available on application of a presumption: rebutting the presumption. Under the pre-UFCA law, however, that required proving (somehow) by a preponderance of evidence that a debtor had not acted with specific intent even though he had knowingly and gratuitously shucked off assets while insolvent and in the face of losing them to creditors. While that option was available to a transferee in the abstract, the task of doing so credibly must have been daunting at the least—in the face of hard-headed judicial evaluation of the possible realities.

25. The concept of "fair consideration," Minn. Stat. Ch. 68, § 8478 (1923) as applied previously to a transfer, was replaced by the concept of "reasonably equivalent value," Minn. Stat. § 513.44(a)(2). Under the UFCA, the transferee's good faith was required for a finding of "fair consideration," and lack of fair consideration was one of the elements of a fraudulent transfer as defined. Minn.Stat. Ch. 68, §§ 8477(a)-(b) and 8478 (1923). Now, good faith is not to be examined in that context; but it is relevant to the application of various affirmative defenses under MUFTA. Minn.Stat. §§ 513.48(a), (b)(2), (d), and (f)(3). *See also* UFTA § 4, cmt. 2 (2006). Unlike the UFCA, MUFTA does not prescribe different tests for transfers made for the purpose of security and for absolute transfers. *Id.*, cmt. 3. Finally, there is a minor change in the determination of one sort of insolvency, as contemplated for the debtor-transferor: "unreasonably small capital" was replaced with "unreasonably small [assets] in relation to the business or transaction." *Id.*, cmt. 4.

Fourth, the defense cites MUFTA's particularized treatment of transferees that were "insiders" of the debtor-transferor, as a major change from legal governance before Minnesota's adoption of the Uniform Acts. *See* Minn.Stat. § 513.45(b) (declaring void as to all present creditors, transfers by insolvent debtor to insider, when insider "had reasonable cause to believe that the debtor was insolvent").[26]

Contrary to the defense's argument, this provision reflects and codifies longstanding Minnesota precedent that imposed liability on a violation of fiduciary status. For over a century, the Minnesota Supreme Court has held that directors of an insolvent corporation who are also creditors of it "cannot secure to themselves any advantage or preference over other creditors"; and when they do, "equity will set aside the transactions at the suit of creditors of the corporation, . . . without reference to . . . actual fraudulent intent on the part of the directors, for the right of the creditors does not depend upon fraud and fact, but on the violation of the fiduciary relation of the directors." *Taylor v. Mitchell,* 80 Minn. 492, 83 N.W. 418, 420 (1900). *See also Snyder Electric Corp. v. Fleming,* 305 N.W.2d 863, 869 (Minn.1981); *St. James Capital Corp. v. Pallet Recycling Assocs. of N. Am., Inc.,* 589 N.W.2d 511, 514 (Minn.Ct.App.1999) (reaffirming continuing viability of remedy against officers and directors, under principles of fiduciary duty, but declining to extend it beyond liability for self-dealing).

At its core, insider liability under this provision of MUFTA is nothing new. As part of a comprehensive body of uniform legislation promulgated elsewhere, it was likely not intended to codify the preexisting Minnesota authority in specific. But there is no doubt that it embodies the same principles, though subject to some changes in the enunciated requirements.[27]

Liability under MUFTA's insider provisions thus is not "created by statute." Its articulation in MUFTA gives no basis to apply Subd. 1(2) to a suit under the isolated provision of Minn.Stat. § 513.45(b), or under any other provision of MUFTA.

The fifth and last aspect proffered as a UFCA-created change is the standing to sue afforded "future creditors"—that is, creditors whose claims against a debtor-transferor come into existence after the challenged transfer.

Before the enactment of the UFCA, there was authority in Minnesota for the proposition that proof of a debtor's actual intent to defraud *existing* creditors—those that held claims at the time of an outright transfer—would not satisfy the intent element for a "future creditor" that sued to set aside the same transfer. *Coulter v. Meining,* 143 Minn. 104, 172 N.W. 910, 912 (1919) (citing *Fullington v. Northwestern Breeders' Ass'n,* 48 Minn. 490, 51 N.W. 475 (1892)). *See also, e.g., Williams v. Kemper,* 99 Minn. 301, 109 N.W. 242 (1906); *Stone v. Myers,* 9 Minn. 303, 1864 WL 1422, *6 (1864). Under this line of authori-

---

**26.** The definition of the term "insider" under Minn.Stat. § 513.41(7) features a long list of nonexclusive examples. All of them stem from pre-existing relationships between the debtor and the putative insider.

**27.** It should be noted: some of those changes do not favor the plaintiff in a fraudulent transfer action against an insider. The class of vulnerable insider-defendants has broadened considerably beyond corporate directors

and officers, as previously articulated in Minnesota case law. However, the addition of a generalized scienter requirement, knowledge or other "reasonable cause" to believe the corporation was insolvent, actually may add to the case that a plaintiff must prove. Arguably, this narrows the class of liable parties at least a little. *See* Uniform Fraudulent Transfer Act § 5, at 3 (2006).

ty, a future creditor had to show that in making the transfer the debtor had intended to defraud *future* creditors. *Fullington*, 51 N.W. at 476 (holding that under statute of Elizabeth and subsequent legislation, "[t]here is no warrant . . . for holding that one class of creditors may avoid a conveyance merely on the ground that it was intended to, and, if sustained, will defraud another class").

With the adoption of the UFCA, however, actual intent ("as distinguished from intent presumed in law") to defraud either present *or* future creditors could render a transfer fraudulent *as to both classes*. Minn.Stat. Ch. 68, § 8481 (1923). The wording of MUFTA's treatment of this point is somewhat different; but the effect is the same. *See* Minn.Stat. § 513.44(a) (2012) (transfers may be held fraudulent as to present or future creditors). *Cf.* Minn. Stat. § 513.45 (transfers may be held fraudulent as to present creditors, on stated elements that differ from those of Minn. Stat. § 513.44(a)).

Contrary to the defense's argument, the line of demarcation between the rules of decision here is not knife-sharp. In an earlier opinion, the Minnesota Supreme Court had observed, as "well settled," that where voluntary conveyances are actually fraudulent, and "the purpose *or effect* of the same is to prejudice subsequent creditors, such conveyances will *also* be void *as to them*"—even as the same court recognized the need to demonstrate "additional facts tending to prove fraud in fact, [to] apply to cases of subsequent indebtedness." *Walsh v. Byrnes*, 39 Minn. 527, 40 N.W. 831, 832 (1888). Whatever its deri-

vation, this pronouncement seems to contemplate the use of proof of fraudulent intent to the benefit of either class of creditors. Its presence in pre-UFCA case law shows that the transition on the UFCA's enactment was not as abrupt on this point as the defense characterizes it.[28]

As a result, MUFTA's greater cross-applicability of proof of intent for creditor-plaintiffs of both classes looks more like an incorporation of that earlier, variant line of decision under the common law of fraudulent conveyance and the judicial construction of earlier statute. This again undercuts the argument for characterizing liability under MUFTA as "created by statute," and bolsters the classification of relief under MUFTA as "on the ground of fraud."[29]

The core of relief under MUFTA is traceable back to the common law; and the aspects of the statutory regime that are more extensively restructured or rearticulated still have their antecedents, in common law and its intermediate descendants in statute. Under an analysis informed by *McDaniel*, the basis for applying Subd. 1(6) as the limitations period for the Trustee's avoidance litigation is far stronger than the case for Subd. 1(2).

All of this presupposes that *McDaniel* furnishes the rule of decision. This conclusion seems self-evident, despite the defense's strenuous cavil. At this point, it is appropriate to address the defense's pitch for a different source of authority for the rule of decision of *federal* origin, which the defense would parlay to compel a different outcome. That, as noted earlier (pp. 11–12), is *Tuttle v. Lorillard Tobacco Co.*, 377

---

28. This can probably be chalked up to another of the inconsistencies in case law-derived governance that the enactment of the UFCA was to harmonize. *See* Bridgman, *UFCA in Minnesota*, 7 Minn. L.Rev. at 453–454.

29. And if this conclusion is too stretched, a single marked departure in one corner of a statute otherwise traceable to the common law of fraud is not strong enough to tip the conclusion. *Orr v. Kinderhill Corp.*, 991 F.2d at 33.

F.3d 917. The defense says that *Tuttle* relegates the Trustee's avoidance litigation to the limitations period under Subd. 1(2), certainly and finally.

*Tuttle* came out of the waive of litigation against manufacturers of tobacco products in which ailing tobacco users, or their survivors, sought recoveries on the theory that the manufacturers had fraudulently concealed from the consuming public the health-related risks of tobacco usage. The widow-plaintiff in *Tuttle* had sued in the federal courts under theories of common law fraud, negligence, and conspiracy, plus various Minnesota statutes that are sometimes colloquially termed "consumer fraud laws."

Because of the lapse of time between the decedent's purchase and usage of tobacco and the commencement of suit, the applicable statute of limitations was a key issue for the litigation. The District Court for the District of Minnesota granted summary judgment to the defendants, on alternate bases including the expiration of applicable limitations periods before the commencement of suit. On appeal, the Eighth Circuit affirmed the district court's dismissal of the plaintiff's claims under the Minnesota Prevention of Consumer Fraud Act, Minn.Stat. § 325(f).68, *et seq.;* the Minnesota Unlawful Trade Practices Act, Minn.Stat. § 325(d).09, *et seq.;* and the Minnesota False Statement in Advertising Act, Minn.Stat. § 325(f) 67. It did so on its "agree[ment] with the district court that the consumer protection claims [under those statutes] depend on the purchase of a product within the applicable six-year limitations period," which it deemed to be that under Subd. 1(2). 377 F.3d at 926.

The defense uses the term "statutory fraud claims" to identify the *Tuttle* plaintiff's claims under these statutes. It insists that *Tuttle* creates a sharp cleaving line between any action brought on any Minnesota statute (even if the statute incorporates any of the structure of the legal concept of fraud), and an action pleaded specifically on the common law of fraud.

The problem is, that articulation does not appear in the text of *Tuttle* and it does not feature at all in the reasoning for the outcome on appeal. Nor does the phrase "statutory fraud claim." The *Tuttle* court stated that the plaintiff's "*statutory* claims are governed by [a] six-year statute of limitations," emphasis added, and then cited Subd. 1(2). It went on to note that, "[h]owever, '[t]his provision does not include a discovery allowance as does the statute of limitations applicable to fraud claims.'" 377 F.3d at 926. For that holding, it cited *Klehr v. A.O. Smith Corp.,* 875 F.Supp. 1342, 1352–1353 (D.Minn.1995), *aff'd,* 87 F.3d 231 (8th Cir.1996), *aff'd,* 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997). *Klehr* was a trial court decision that similarly presupposed that its claims were classified under Subd. 1(2), without discussion of why any alternative was not suitable. And, perhaps tellingly, *Tuttle* did not even use the terms "consumer fraud claims" to denote the statutory claims it treated; rather, the references are to "consumer statutes" and "consumer protection claims."

Those references were no accident, because *Tuttle* did not present the issue so sharply outlined here, i.e., the choice between Subds. 1(2) and 1(6) for an action brought under a statute that is argued to be directly in the nature of a common law claim for fraud, or decisively not in that nature. *Tuttle* does not contain any analysis of the essence of its statutory causes of action. It does not cite *McDaniel* as an aid to analysis under Subd. 1(2). And it does not use a *McDaniel*-styled analysis at all.

As much as *Tuttle* speaks to the issue squarely before that court, its authority

does not apply to the matter at bar. *McDaniel* does not address the specific issue at bar either; but it is relevant authority from a state supreme court with the final power to determine the construction of its state's statutes and their classifications. And, it articulates a rule for analysis that requires little extension to reach the problem here. Considerations of federalism require deference to that forum, and compel the application of its analysis.[30]

On those considerations, it is clear that the Trustee seeks relief "on the ground of fraud" through his claims under MUFTA, and that the limitations period of Minn. Stat. § 541.05, Subd. 1(6) governs.[31]

So, ***Ruling # 1:*** The Trustee's avoidance claims under MUFTA are subject to a six-year limitations period. However, the discovery allowance of Subd. 1(6) may operate to extend the scope of transfers

---

**30.** For the same reasons, the local decisions from the United States District Court cited by the defense do not support the outcome urged either.

**31.** As an aside—but only as an aside: *Tuttle* actually could fit into *McDaniel's* analysis without stretching either decision's rationale and without altering its own outcome. The Minnesota Supreme Court has held that

> [i]n passing consumer fraud statutes, the legislature clearly intended to make it easier to sue for consumer fraud than it had been to sue for fraud at common law. The legislature's intent is evidenced by the *elimination* of elements of common law fraud, such as proof of damages or reliance on misrepresentations.

*Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 12 (Minn.2001) (quoting *State by Humphrey v. Alpine Air Prods., Inc.*, 500 N.W.2d 788, 790 (Minn.1993)); emphasis in original. Such major alterations from the corollary common law arguably make the resultant liability created by statute, even under the broad pronouncements of *Orr v. Kinderhill Corp.*

**32.** The applicable text of § 546(a)(1) is:

subject to avoidance to those made before that six-year period, if the Trustee proves the factual basis for it.

## ISSUE # 2: INTERACTION OF STATE–LAW STATUTE OF LIMITATIONS AND 11 U.S.C. § 546.

The second issue posed by the defense is the effect to be given to the running of time post-bankruptcy up to the statutory deadline for commencement of suit by the Trustee, 11 U.S.C. § 546(a)(1)(A),[32] in determining the scope of the six-year period of limitations under Subd. 1(6). This issue is another one that goes toward establishing the beginning and the end of a base period of vulnerability to avoidance, as to particular transfers by particular defendants.

The defense argues that the two periods "run at the same time" and cannot cumu-

> (a) An action or proceeding under [11 U.S.C. § ] 544, . . . may not be commenced after the earlier of—
> (1) the later of—
> (A) 2 years after the entry of the order for relief; or
> (B) 1 year after the appointment or election of the first trustee under [11 U.S.C. § ] 1104, . . . if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
> (2) the time the case is closed or dismissed.

Applying this statute takes some thinking. The Trustee in these cases was appointed on February 26, 2009, which fell within two years of the entry of the order for relief in these cases. (An order for relief is deemed to have been entered on the commencement of these voluntary cases. 11 U.S.C. § 301(b).) So, the two-year period of § 546(a)(1) is the "later" of the two alternatives within that sub-subsection. Because all of the cases are still open, the Trustee's right to sue has not been extinguished by § 546(a)(2). For these cases, then, the expiration of two years from the filing of the relevant petition fixes the deadline for commencement of suit by operation of § 546(a) generally.

late. If this position is correct, every day passing after the commencement of the two-year period on the filing of the relevant bankruptcy petition "counts toward" a reachback under the six-year limitations period, in an action timely-commenced under § 546(a)(1).

Put another way, if the defense is correct, in a bankruptcy case the six-year base limitations period under state law runs back from the date on which a proceeding for avoidance under § 544 is actually commenced *in* the bankruptcy case, as long as that was before the deadline fixed by § 546(a)(1).[33] This isolated question is driven by § 546 and other law specific to bankruptcy—not by the terms of an applicable state statute of limitations.

The defense does not cite any binding precedential authority from the Eighth Circuit or any from the lower local federal courts. There is none. The defense argument is largely built on the strength of "policy," said to be articulated in *McCuskey v. Central Trailer Servs., Ltd.*, 37 F.3d 1329, 1331 (8th Cir.1994).

For his part, the Trustee cites on-point rulings from other federal jurisdictions. These decisions are not precedential but the Trustee insists they are strongly persuasive. *E.g., In re Antex, Inc.*, 397 B.R. 168 (1st Cir. BAP 2008); *In re Bernard L. Madoff Inv. Secs. LLC*, 445 B.R. 206 (Bankr.S.D.N.Y.2011); *In re American*

*Energy Trading, Inc.*, 291 B.R. 159 (Bankr.W.D.Mo.2003).

The Trustee urges that § 546(a)(1) be construed as it was in these decisions, specifically in the context of avoidance pursuant to § 544, with its incorporation of the substance of state law including limitations periods under state law.[34] As the Trustee characterizes it, any external statute of limitations is tolled from the entry of the order for relief until the timely commencement of an avoidance action. Under this theory, the two periods—up to two or more years under § 546(a)(1)(A)–(B), and the base six-year period under Subd. 1(6)—would cumulate partly, up to nearly-completely; but the cumulation would work backward. As long as suit was commenced by the deadline under §§ 546(a)(1), under Subd. 1(6) the minimum reachback to an avoidable transfer would go back a full six years from the date of the order for relief. *See In re Bernard L. Madoff Inv. Secs. LLC*, 445 B.R. at 231–232 (collecting bankruptcy court decisions in accord).[35]

For the defense's argument, two points dictate caution in using *McCuskey* as readily or as heavily as urged. One is context-based, one is structural.

First, *McCuskey* did not treat the issue at bar, or anything close to it. The plaintiff in *McCuskey* was a trustee under

---

**33.** Once the two-year post-petition period passes, the avoidance remedy under § 544 would lapse; it is no longer available to the bankruptcy estate even if the transfer occurred within the six years prior to the deadline under § 546(a)(1). This proposition was adopted and applied in *In re Quality Pontiac,* 222 B.R. at 869. Because the trustee's action in that case was commenced after the deadline under § 546(a)(1), the decision did not reach the issue posed here: "just how far back before the commencement of the bankruptcy case do a trustee's avoiding powers under § 544 reach," on application of a stat-

ute of limitations under state law and in an adversary proceeding timely commenced under § 546(a)(1)? 222 B.R. at 870 n. 11.

**34.** *McCuskey* involved trustee's litigation to avoid preferential transfers, under the purely-federal substantive governance of 11 U.S.C. § 547(b).

**35.** The B.A.P. in *In re Antex, Inc.* did not expressly articulate this rationale. The outcome under its analysis gets there as if it had, though.

Chapter 7 who had been appointed after the conversion of a Chapter 11 case in which an operating trustee had been appointed and had functioned. The issue was whether the plaintiff-trustee had the benefit of a new, two-year limitations period for commencement of avoidance litigation, starting on the date of his appointment, to supplant the lapsed two-year period that his predecessor had had.

Second, the *McCuskey* court applied a statutory text made significantly different by intervening Congressional action. Section 546 was amended by the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, 108 Stat. 4106, 4126–4127 (1994). The previous language was markedly less complex in its provisions to fix the deadline for suit.[36] The differences do not affect the correctness of *McCuskey's* characterization of § 546(a)(1) as a "provision of limitations," with a purpose "to bring finality to an issue and to prevent stale claims," 37 F.3d at 1333. However, the complexity of the amended statute embodies a more fine-tuned balance between the interests of bankruptcy estates and potential defendants than the previous law did. That alone suggests caution in applying *McCuskey's* broader observations with the heavy thrust that the defense makes.

There is a further difficulty with using *McCuskey* to glean a "policy" behind § 546 that would generally apply to all avoidance proceedings under Chapter 5. *McCuskey* dealt with a federally-*created* and -*structured* avoidance power—under 11 U.S.C. § 547(b)—rather than a federally-*enabled* one—as under 11 U.S.C. § 544(b). For preferential transfers under § 547(b), there is no separate applicable statute of limitations that fixes a "reachback" from the commencement of suit toward a subject transfer, for timeliness considerations. The window of vulnerability to avoidance is in the *substantive* elements under the statute—11 U.S.C. § 547(b)(4)—and it dates back from the commencement of the bankruptcy cases. Section 546(a) *then* applies to set a deadline looking forward, for the *exercise* of the avoidance power in the administration of the estate. It divests the estate of the power (and the potential recovery) if suit is not timely commenced within the specified confines of the bankruptcy case.[37]

On the other hand, § 544(b)(1), the empowerment under which the Trustee has invoked MUFTA, does not contain any textual provision for reachback; and of course neither does MUFTA itself. Any broader policy toward the repose of aging claims is effectuated in this context by the general state statute of limitations.[38]

Outside of bankruptcy the analysis of limitations periods is made against two readily-fixed points: the date of the alleged injury and the date of commence-

---

36. The text in effect for *McCuskey* provided, in pertinent part:
   (a) An action or proceeding under [11 U.S.C. §§ ] 544, . . . may not be commenced after the earlier of—
      (1) two years after the appointment of a trustee under [11 U.S.C. § ] 1104 . . .; or
      (2) the time the case is closed or dismissed.

37. Section 546 functions to prevent staleness in the litigation of claims, just as statutes of limitation do. However, the targeted quality is different in kind—staleness of the estate and staleness in its administration, versus staleness of a claim itself. Section 546 is a goad toward wrapping up the estate's administration. It does not link directly to the obsolescing of the requisite evidence.

38. All parties have assumed this without controversy. On that assumption, the issue was *which* state statute of limitations applied to set the length of the reachback and the boundaries of the period of vulnerability to avoidance—as treated in the earlier text of this decision.

ment of suit. Usually, the holder of a claim put into suit outside of bankruptcy was active in the operative events, or at least had been affected directly by them, and was involved directly or indirectly with the prospective defendant when the injury occurred. Such a claimant is more properly put to the onus of vigilance in suing, having as it does a direct and personal grasp of the basis for suit.

In bankruptcy, a trustee inherits the results of the acts and experiences of a third party, the debtor. By tacit definition, the trustee was not to have been involved in them.[39] So, perforce, a trustee needs time and effort to burrow into all of the subject matter relative to the administration of the estate and the recovery effort via avoidance. Some of that information will be presently available. Much of it—that historically-rooted—will require reconstruction, often from poorly-kept records and flawed evidence. The steward of a bankruptcy estate thus has a right to some consideration when it comes to the rigors of limitations periods on claims that he must investigate and reconstruct from scratch, long after the fact.

Such deference has been forthcoming from the courts. Most often though, it has been on vague grounds of a "strong policy goal[ ] involved," toward "foster[ing] a trustee's ability to recover property for the benefit of the estate." *In re Bernard L. Madoff Inv. Secs. LLC,* 445 B.R. at 230–231. This sort of pronouncement recognizes the reality of the problem. But, it does not give the comfort of an objective basis in external law, as statute-based adjudication would dictate.[40]

With that thought, the defense points out that § 546(a) has no provision on its face for the tolling of any external limitations period, as contrasted with 11 U.S.C. § 108(a).[41] However, the defense's near-

**39.** The general provisions of the Bankruptcy Code do not require that a prospective trustee be a "disinterested person" as to a particular debtor or case, 11 U.S.C. § 101(14), as a prerequisite for appointment by the United States Trustee. *See* 11 U.S.C. §§ 321–322. A trustee elected in a Chapter 11 case must be a disinterested person. 11 U.S.C. §§ 1104(b)(1)-(2). Whatever the statutory requirements for qualification, however, the effective operation of an administrative process premised on fiduciary status for the estate's steward dictates that persons not be appointed as trustee if they have actual or potential conflicts of interest, or had been materially involved or acquainted with the debtor or parties in interest to the case before the bankruptcy filing. In practice, the United States Trustee vets such appointments on these sensitivities. In addition, interim trustees do the right thing, by resigning if such clouds emerge.

**40.** It is disconcerting that this line of authority keeps replicating itself. For the summary pronouncement—the one grounded in the "policy" consideration and no more—the descendants only string-cite back to earlier decisions in the line and eventually to the treatise *Collier on Bankruptcy.* E.g., *In re Trinsum Group, Inc.,* 460 B.R. 379, 390 (Bankr. S.D.N.Y.2011); *In re Pharmacy Distrib. Servs., Inc.,* 455 B.R. 817, 823–824 (Bankr.S.D.Fla. 2011); *In re Bernard L. Madoff Inv. Secs. LLC,* 454 B.R. 317, 337–338 (Bankr.S.D.N.Y.2011). But when the *Collier* source is consulted—currently at Alan N. Resnick and Henry J. Sommer eds., 5 *Collier on Bankruptcy,* ¶ 546.02[1][b] (16th ed. 2012)—there is only the same summarily-worded statement of the outcome. This section of *Collier* has no analysis of the statutes; and its sole cited authority is case law that used earlier updates of the same treatise as its primary authority!

**41.** In pertinent part, this statute provides:
(a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

exclusive reliance on that plus *McCuskey's* references to a different sort of policy are no more satisfying than the Trustee's argument.[42]

Neither side recognizes the real source of the answer. For the Trustee's litigation under § 544(b), the operation of a reachback is fixed by statute just as it is by § 547(b)(4)—more subtly, but just as firmly. The interaction among several governing statutes is the key.

In exercise of the Code's "strongarm" powers, a trustee is allowed to:

> ... avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [11 U.S.C. § ] 502 ... or that is not allowable only under [11 U.S.C. § ] 502(e)....

11 U.S.C. § 544(b)(1). A "creditor" is "an entity that has a claim against the debtor that arose at the time of or before the order for relief against the debtor." 11 U.S.C. § 101(10)(A). The referent creditor here must have a claim "allowable" in the bankruptcy case. This means, first, that the creditor must have had a "right to payment" from the debtor. 11 U.S.C. § 101(5)(A) (definition of "claim"). In turn, that "claim" may be "allowed" for the purposes of the bankruptcy case and the administration of the estate, as it stood in validity and amount under nonbankruptcy law "as of the date of filing of the bankruptcy petition." 11 U.S.C. § 502(b) (preamble).

If a creditor qualifies as such within the understandings of bankruptcy law, its attendant rights under state law follow that status. In the sense of the validity and amount of its claim, this applies to the place of the creditor's claim in the administration of the estate, i.e., for distribution. But it also has to apply to other provisions of the Bankruptcy Code that implicate different aspects of the position or status of such a creditor. Thus, if such a referent-creditor would have had the right to bring suit to set aside a fraudulent transfer as of the date of the bankruptcy filing, the trustee can use that referent-creditor's standing to sue on behalf of the bankruptcy estate. The right would be established by the possession of a legally-enforceable right to payment from the debtor, and a subject transfer that fell within the applicable limitations period as of that date. The trustee then would have to prove the same case for avoidance that the creditor would have had to meet outside of bankruptcy.

By vesting the trustee with such derivative standing, the interaction of all of these provisions clearly contemplates a reach-

---

(2) two years after the order for relief. The defense is correct in pointing out the fundamental error committed by those courts that rely on § 108(a) as authority for a tolling of limitations periods in actions under § 544. *E.g., Lippe v. Bairnco Corp.*, 225 B.R. 846, 853 (S.D.N.Y.1998); *In re Southern Health Care of Ark., Inc.*, 299 B.R. 918, 922 (Bankr.E.D.Ark. 2003). The flaw stems from the differing effects of the two statutes. Section 108(a) only applies to causes of action originally held by the debtor pre-petition, to which the trustee succeeds by operation of 11 U.S.C. § 541(a). Hence, § 108 does not apply to avoidance powers conferred on the bankruptcy estate by separate statute. *E.g., In re Sears Petroleum & Transp. Corp.*, 417 F.Supp.2d 212, 223–225 (D.Mass.2006); *In re Downtown Inv. Club III*, 89 B.R. 59, 65 (9th Cir. BAP 1988); *In re Am. Energy Trading, Inc.*, 291 B.R. 159, 165 n. 10 (Bankr.W.D.Mo.2003).

**42.** The defense also fails to recognize that even in *McCuskey's* own substantive context there is a full cumulation of periods relevant to the scope of vulnerable transfers, coming from the reachback under § 547(b)(4). As long as the trustee meets the deadline of § 546(a)(1), suit for avoidance of a preference is timely-commenced as to any transfer within the full statutorily-specified pre-petition period.

back for the estate's benefit, to transfers occurring before the bankruptcy filing, within the full base period under the state law that would apply to such a creditor. Under these statutes' interaction, that base period begins on the date of the filing of the bankruptcy petition—the date as of which its allowability is to be determined— and runs back. Had the bankruptcy case not intervened, that creditor could have sued on that date in a nonbankruptcy forum to set aside any transfer that took place within the full limitations period under applicable bankruptcy law. As the inheritor of all the same right of suit, a trustee may do so as well.

The defense asperses those courts that articulated the recognition of a cumulating on more functional considerations, like "breathing room" for the trustee and the realities of the burden of estate administration. As apt as these connotative considerations may be, they are not the reason why the Trustee has the options he has.[43]

Thus, *Ruling # 2:* As long as the Trustee commenced any individual action in this avoidance docket by the deadline under § 546(a)(1), his avoidance power can reach, at minimum, transfers that took place within the full length of the six-year base limitations period under Subd. 1(6), dating back from the date of the subject Debtor's bankruptcy filing.

### ISSUE # 3: DISCOVERY ALLOWANCE; AVAILABILITY AND OPERATION OF TOLLING PROVISIONS.

### Minn.Stat. § 541.05, Subd. 1(6), Fraudulent Concealment, Equitable Tolling, Adverse Domination.

With the specific statute of limitations established and the base six-year period of

vulnerability to suit fixed in time in relation to the Debtors' bankruptcy filings, the focus shifts to the major thrust of the Trustee's avoidance effort. The issue now is: how much further back than the six-year period can the Trustee reach to avoid transfers by a subject Debtor to any of the defendants?

Subd. 1(6) requires a discovery allowance to be considered, on a plaintiff's assertion that a right of suit in the nature of fraud did not accrue because it was not capable of discovery until after the relevant events. The Trustee has invoked the discovery allowance. Numerous defendants took issue with that. In the context of a bankruptcy case, the threshold point is the identity of the party as to which the discovery allowance is to be gauged on its terms.

The discovery allowance was not the only basis on which the Trustee urged that the limitations period be extended or eased. He asserts that he would have the benefit of non-statutory tolling doctrines as well. At various points, the Trustee has asserted them as if they applied regardless of whether Subd. 1(2) or Subd. 1(6) governed. At others he appeared to concede that one or all of them would not, if Subd. 1(6) governed with its discovery allowance.

As a judicial hedge if nothing else, it is prudent to treat these theories as if the Trustee were maintaining them all. The threshold point actually spans these theories.

### A. For Subd. 1(6) and the Other Doctrines: Which Party is the Aggrieved or Referent Party?

■ Under Subd. 1(6), a cause of action "on the ground of fraud ... shall not be

---

43. It is entirely possible that these considerations were merged into the way Congress

acted in 1978, to wisely structure the strong-arm remedy in its definitional aspects.

deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."

To establish his right to this discovery allowance, the Trustee points to the obvious, in a general way and in a specific. First, a Ponzi scheme is sustained only so long as unwitting lender-investors continue to infuse large sums of cash.[44] Second, Tom Petters had to and did maintain utter secrecy to ensure that his lenders continued to do so.[45]

The Trustee insists that a plaintiff seeking to set aside earlier transfers out of a long-running Ponzi scheme should not have its rights to suit cut off by a strict application of the base six-year period. As he points out, all such lenders were gulled, but the last-in creditors were misled to far greater prejudice. The Trustee urges a liberal application of the discovery allowance in the context of these cases, in recognition of the pervasive fraud. He argues that no creditor could have learned of the fraud until the whole artifice collapsed in the late summer of 2008. With some gumption, the Trustee argues that this could expose *all* transferees back to the inception of the whole scheme, if a means of discovering the fraud was not available until the very end.[46] The underlying thought, never articulated to pin-point clarity, is that the avoidance cause of action did not accrue until the collapse or shortly after it. *Trustee's Omnibus Memorandum* [Dkt. No. 1158], at 11, 20–21, and especially 42–44 [CM/ECF pp. 41, 50–51, and 72–74].

In litigation by a trustee in bankruptcy, the discovery allowance poses a threshold issue: who or what is the "aggrieved party," as to which the relevant notice or knowledge is to be determined to fix the allowance and its effect? This point is material in its own right, and the same question cascades through the defense's other theories for dismissal.

In his initial written briefing, the Trustee argued on the assumption that *he* was the aggrieved party. He cited decisions from other jurisdictions (most arising out of clawback litigation in Ponzi scheme cases) in which that status was deemed as an unspoken postulate. *Trustee's Omnibus Memorandum*, 60–61. In the next breath, the predictable pitch came: it was not possible for the Trustee *himself* to have had any knowledge, personal or imputed, before the Petters scheme was subjected to federal jurisdiction.[47] Thus, as

---

**44.** In the case law's treatment of Ponzi schemes, this is virtually a judicially-noticed fact. *E.g.*, *In re Agric. Research and Tech. Grp., Inc.*, 916 F.2d 528, 536 (9th Cir.1990).

**45.** At various points in other litigation in these cases, the Trustee, his attorneys, or his forensic accountant have mentioned uncovering evidence of fraud on lender-investors to the Petters operation that dated to 1995 or before. The earliest transfers subject to this avoidance litigation appear to date from 1998–1999.

**46.** Outside of bankruptcy, and to the benefit of an individual creditor with standing under Minnesota law, this would operate to *commence* the six-year period for commencement of suit, by deeming the accrual as of that date.

Potential defendants' vulnerability would be extended indefinitely back, as long as the transfers were fraudulent under substantive law. In bankruptcy's context, the deadline for commencement of suit is altered by the action of § 546(a)(1); but the principles for an extension of the period of vulnerability are the same.

**47.** The Trustee identifies that date as the appointment of a receiver in the proceedings in the United States District Court ancillary to the criminal proceedings against Tom Petters, i.e., October 8, 2008. Because the same person was later appointed trustee in the bankruptcy cases that he commenced in his capacity as receiver, *Ritchie Special Credit Invs., Ltd. v. U.S. Trustee*, 620 F.3d at 849, there is no possible controversy over the actuality of

the Trustee would have it, he was well within a six-year limitations period looking forward; and the discovery allowance locked in and extended back indefinitely from that date, by operation of law alone. With the bankruptcy filings following soon after that, and suit having been timely commenced by the deadline of § 546(a)(1)(A) [48], the defense has no cognizable issue about the discovery allowance or the vulnerability to suit of any defendant for any transfer. Or so the Trustee would relegate all of the defense's assertions of the statute of limitations.

This way of conceiving the problem feels like a tautology. The circularity comes from the nature of bankruptcy, as an ameliorative legal process that is started long after any act becomes the subject of avoidance litigation. Because of that, the late-arrived steward of an estate that is created only in that process could not possibly be subject to any legal onus that otherwise would be imposed by a deemed notice that predated the date of appointment. Before appointment, a trustee (or receiver) is not

even *there*, i.e., in the status of a potential party-litigant.

This argument is just too pat. The deferral of the onus of investigation of suit, and their effect on the limitations period, loop around to create themselves; and they are entirely self-serving. [49] In the way this argument casts posture for the discovery allowance, it totally discounts the other constituency with interests that factor into the notion of repose: the prospective defendant and its right to be free of claims rooted in a receding past and based on obsolescing evidence. [50]

Later in the submission of this issue, the Trustee's premise shifted. [51] Under that, the participant for the discovery allowance now could be conceived as the predicate creditor under § 544(b)(1).

This is the correct approach, because it is consistent with the statutory structure. It pushes the Trustee's derivative standing to the boundaries of the statutory limitations analysis, consistently with its application in the other parts. [52] In doing so, though, it channels the outcome on this

knowledge or notice between the holder(s) of the two statuses.

**48.** This statement anticipates the ruling under Issue # 4, at pp. 51–53, *infra.*

**49.** This self-serving quality is imputed only by the effect—not because of questionable intention. After all, the *self* served is the ameliorative process and its constituents, not the trustee as an individual.

**50.** *E.g., Dalton v. Dow Chemical Co.,* 280 Minn. 147, 158 N.W.2d 580, 584 n. 2 (1968); *Wichelman v. Messner,* 250 Minn. 88, 83 N.W.2d 800, 817 (1957); *H.D. v. White,* 483 N.W.2d 501, 503 (Minn.Ct.App.1992).

**51.** *See Trustee's Memorandum in Opposition to Motion to Dismiss* in *Kelley v. Metro Gem, Inc., et al.,* [ADV 10–4352, Dkt. No. 35], 2–3 (now stating, "[t]he statute of limitation period for the Trustee begins to run commensu-

rate with when *the last creditor* could reasonably have discovered the fraudulent nature of a particular transfer" (emphasis added)). In oral argument for this submission, the Trustee's counsel also shifted the identification.

**52.** Using the Trustee's personal stance as of the date of his appointment (as trustee or receiver, it matters not) seemed to match to the articulation of a single step of the analysis, in the sense that he was the named plaintiff and the benefit of the discovery allowance does inure to plaintiffs-in-litigation as a class. However, this was an isolated and abstract take on the problem, and too easy an answer. The Trustee is the named plaintiff only because he has to be, in the collectivity of the bankruptcy process. But toward the benefit of creditors generally, the Bankruptcy Code empowers him to sue from the stance of a third party, a single creditor. That third party's options must delimit the bankruptcy estate's right to sue, in all respects.

issue away from the perfunctory one that the Trustee urged at first, in which there is really no possible fact dispute going to actual notice or knowledge and hence no real controversy about the discovery allowance at all.

The existence of notice or knowledge for discovery-allowance purposes will be specific to each bankruptcy case from which a given avoidance proceeding arises. The possible cutoff of an unlimited discovery allowance under Subd. 1(6) will turn on the actual, historical facts involving the predicate creditor in whose status the trustee sues in any particular adversary proceeding. If as of the date of the bankruptcy filing the predicate creditor truly knew nothing of the "facts constituting the fraud" of the Ponzi scheme, then the reachback extends as the Trustee argues. If before the bankruptcy filing the predicate creditor knew or discovered enough to equate to a discovery of the facts,[53] the result could be different, as to the scope in time of transfers subject to avoidance.[54]

So, **Ruling # 3A:** The extension of avoidance at the Trustee's instance under color of the discovery allowance of Subd. 1(6) to any transfer that took place earlier than the six-year base period of that subdivision will turn on whether the predicate creditor for a particular adversary proceeding had discovered the facts constituting the fraud of the Petters Ponzi scheme, as they applied to such a transfer.

### B. Other Tolling Doctrines.

The Trustee structured his original argument in alternate tracks, to cover his request for an extension of the base period

whether Subd. 1(2) were adopted or Subd. 1(6). Against an adoption of Subd. 1(2), he argued for several judicially-created tolling doctrines to substitute for the statutory discovery allowance. At various points, the Trustee seemed to argue that one or more of these alternatives applied even if Subd. 1(6) were the statute of limitations.

In the end it is not entirely clear that this is his position. From the standpoint of raw advocacy it is not inconceivable, though. By its internal articulation, at least one of the alternate doctrines would involve an easier burden in proof, via simpler and less proceeding-specific elements.

■ Whether the Trustee really advocates the cumulation of the judicially-created tolling doctrines with Subd. 1(6) or not, all of them will be treated. Conceptually, some of them overlap with the underpinnings of the discovery allowance. In any event, with applicability and/or substance unsettled throughout this palette of law, a comprehensive treatment of all alternatives is appropriate. This is made more challenging by a dearth of precedent from the Minnesota Supreme Court, about two of the doctrines at all and about the scope of the third. In such a situation, a federal court is still to "ascertain and apply" the "state law that supplies the rule of decision . . . even though it has not been expounded by the highest court of the State." *Fidelity Union Trust Co. v. Field,* 311 U.S. 169, 177, 61 S.Ct. 176, 178, 85 L.Ed. 109 (1940). The "job is to predict what the Supreme Court of [the State] would do if faced with the case before" the federal court. *In re*

---

**53.** This phrase anticipates the substantive issue under the discovery allowance—which is *not* among the issues in this grouping.

**54.** For the task at bar, the parties did not present argument as to how this would work, under the possible permutations. The near-exclusive focus of the defense was defeating

an application of Subd. 1(6). The Trustee's argument did not encompass anything other than an indefinite reachback. In the cautious exercise of judicial restraint, the implications of earlier knowledge or notice on the part of the predicate creditor are left for another day.

*Popkin & Stern*, 340 F.3d 709, 716–717 (8th Cir.2003).

### 1. Fraudulent Concealment.

■■ The Minnesota courts have long recognized that the running of the statute of limitations may be tolled where the factual bases of a cause of action were fraudulently concealed. *E.g., Schmucking v. Mayo*, 183 Minn. 37, 39–41, 235 N.W. 633, 633–634 (1931). Tolling operates on a statute of limitations that has already begun to run, on a cause of action that has already accrued. *Kopperud v. Agers*, 312 N.W.2d at 446.[55] The doctrine applies to claims subject to Subd. 1(2). *Curtis v. Altria Group, Inc.*, 792 N.W.2d 836, 860–862 (Minn.Ct.App.2010), *rev'd on other grounds*, 813 N.W.2d 891 (Minn.2012). By implication, it may apply to claims subject to Subd. 1(6). *Id.* (fraudulent concealment doctrine applies to consumer-protection claims established by statute, "absent express legislative intent to the contrary").

The Trustee argues that the base limitations period for his MUFTA claims was tolled almost indefinitely by the long-term deliberate acts of Tom Petters and his confederates to conceal the existence and operation of the Ponzi scheme. The defense strenuously denies that proposition, based on prominent aspects of the Minnesota courts' articulation of the doctrine.

■ The notion of *intentional* concealment certainly has relevance for the *statutory* discovery allowance under Subd. 1(6). The circumstances, strength, and duration of an effort to hide a fraud bear logically on any plaintiff's claim that it could not have learned of the basic facts constituting the fraud and should not be held to a deemed notice of them. *E.g., Duxbury v. Boice*, 70 Minn. 113, 72 N.W. 838, 839–840

(1897) (Wm. Mitchell, J.) (equitable roots of statutory discovery rule dictate that "the means of discovery are equivalent to actual discovery, and that a party must be deemed to have discovered the fraud when, in the exercise of proper diligence, he could and ought to have discovered it").

■ However, by its own terms the *equitable* doctrine of fraudulent concealment applies to cases of concealment by the party against which the cause of action lies, i.e., by the named defendant(s). *Williamson v. Prasciunas*, 661 N.W.2d 645, 650 (Minn.Ct.App.2003) (focusing on "the defendant's conduct" in concealment); *Haberle v. Buchwald*, 480 N.W.2d 351, 357 (Minn.Ct.App.1992); *Goellner v. Butler*, 836 F.2d 426, 431 (8th Cir.1988) (applying Minnesota law); *Helleloid v. Ind. School Dist. No. 361*, 149 F.Supp.2d 863, 868 (D.Minn.2001) (fraudulent concealment tolls statute of limitation where "the defendant has engaged in some behavior that has had the purpose and effect of concealing. . . .").

■ The defense insists that the doctrine cannot be extended consistent with the underlying equitable considerations, to cases where the fraudulent concealment was by a third party not named as a defendant. This argument is entirely justified on the foundational principles. The doctrine's override of a statutory limitations period is equitably justified when strict enforcement of the law would give the unfair benefit of repose to a defendant that had connived. Where the conniver was a third party and the defendant was equally gulled by the fraudulent concealment, there is a lack of the fundamental unfairness that the doctrine is designed to ameliorate.

---

55. *Kopperud* expressly distinguishes tolling from the discovery allowance on claims for fraud—the latter deferring the *accrual* of the cause of action until discovery. *Id.*

The Trustee has not made the argument that the Minnesota Supreme Court would extend the document to a third-party situation like the one at bar. He has not cited subsidiary rulings or dicta in Minnesota's extant fraudulent-concealment jurisprudence that would support such an extension. As a result, there is no basis for a federal court to conclude if it should apply the doctrine because the state forum would recognize it in this context if presented with the issue.

On its own terms, then, the doctrine of fraudulent concealment does not apply independently to toll the limitations period for the Trustee's MUFTA claims against any of the defendants.

## 2. Equitable Tolling.

Anticipating the failure of that theory, the Trustee asserted the doctrine of equitable tolling as a different measure to extend the reachback under MUFTA.

■■■ This judicially-created theory also had roots in the discovery rule. Under it, a limitations period is tolled "when the plaintiff, despite all due diligence, is unable to obtain vital information bearing on the existence of his claim." *Comcast of Ill., X, LLC v. Multi–Vision Elecs., Inc.,* 2005 WL 2177070, *5 (D.Neb.2005). The considerations for this variant of tolling go to the plaintiff's de facto ability to recognize and assemble a basis for suit, a case on the merits. Hence, the focus is on the plaintiff's knowledge, awareness, and intent. The application of equitable tolling does not require a showing of misconduct on the part of the defendant. *Dring v. McDonnell Douglas Corp.,* 58 F.3d 1323, 1328–1329 (8th Cir.1995).

The Trustee pitches equitable tolling as particularly appropriate for litigation on

wrongdoing done through a Ponzi scheme, as opined in *In re Int'l Mgmt. Assocs.,* 2010 WL 2026442, *5 (Bankr.N.D.Ga.2010). Given the unique alignment of parties in avoidance litigation in Ponzi-scheme cases, this argument has some cogency.

However, the equitable tolling doctrine that the Trustee relies on was articulated by the federal courts. It is not a feature of Minnesota state jurisprudence. As held earlier, the Trustee's reliance on Minnesota substantive law means that the attendant Minnesota law of limitations applies— and Minnesota law only. *E.g., Great Plains Trust Co. v. Union Pacific R.R. Co.,* 492 F.3d 986, 995 (8th Cir.2007). All of the cases that the Trustee cites involved statutes of limitation imposed by federal law. Any application of equitable tolling by other jurisdictions that is expressly premised on the limitations law of their own forum states is not relevant, if the principle has not been adopted in the Minnesota state courts.[56]

■■■ The Trustee does not expressly request a ruling that the Minnesota Supreme Court would extend its tolling jurisprudence to adopt the additional, and broader, doctrine of equitable tolling. Even if he had, there again do not seem to be any bases for making that inference, in dicta, rulings on points under other law that address subsidiary aspects common to both, and the like. This may be only a result of the right sort of case not yet making it to the appellate level in Minnesota. But it is also a caution that the adoption of equitable tolling would be a slippery slope, given the tilting of its fairness-based considerations markedly toward one side. In application it could become quite slanted and increasingly de-

---

**56.** *In re Int'l Mgmt. Assocs.,* on which the Trustee principally relies, was one such.

2010 WL 2026442, *5.

viant from the strictures of law, out of judicial deference to the plaintiff's constituency. This key aspect of the adversary process is already well-regulated under Minnesota law, and there is no warrant for a federal court to innovate within it.

The doctrine of equitable tolling is simply not available to the Trustee for his MUFTA-based claims against the defendants.

### 3. Adverse Domination.

The Trustee argued that the doctrine of adverse domination would toll his statute of limitations, no matter which subdivision applied.

■■■ This doctrine is again an offshoot of the discovery rule, applied in the corporate context. *In re Reading Broad., Inc.,* 390 B.R. 532, 552–553 (Bankr.E.D.Pa. 2008). As the Eighth Circuit has observed, the adverse domination doctrine can apply to toll "the statute of limitations as to claims against the officers or directors of a corporation as long as those officers or directors control the corporation." *Resolution Trust Corp. v. Armbruster,* 52 F.3d 748, 751 (8th Cir.1995).

■■■ However, the doctrine lies as to claims *that the corporation would have* against its own directors and officers. It can remedy actions on their part in abuse of their positions of control, i.e., the shunting-away of assertions that they are liable to the corporation, and the stalling of litigation that otherwise could be brought against them. *E.g., Resolution Trust Corp. v. Farmer,* 865 F.Supp. 1143, 1151 (E.D.Pa.1994). This reflects the doctrine's descent out of the discovery rule; only after a shift in corporate control could the claims be brought out and advanced. Hence, fairness again would dictate that

conniving parties be denied the repose that they would otherwise get from having the law (the statute of limitations) applied on its face.

Clearly, this equitable override is as ancillary to the main law (the statute of limitations) as any of the others are. It is available for this litigation only if it is a feature of Minnesota law, or there is a strong case that it would be adopted as such were the Minnesota Supreme Court to consider it. *Resolution Trust Corp. v. Armbruster,* 52 F.3d at 751.

■■■ The Minnesota state courts have not spoken to the doctrine of adverse domination, and they certainly have not adopted it in extant case law. The Trustee argues that the Minnesota Supreme Court would, however, and thus it should be recognized for application here and now. He notes that other federal courts have made the inference for their own forum states' courts. However, it appears that those courts did so on the lone basis that the supreme court of their forum state had already recognized the basic discovery rule for a liberal application in cases of fraud. *E.g., Clark v. Milam,* 847 F.Supp. 409, 422 (S.D.W.Va.1994); *In re Reading Broad., Inc.,* 390 B.R. at 552–553; *Wilson v. Paine,* 288 S.W.3d 284, 288–289 (Ky.2009) (collecting federal case law citations, noting that courts "confronted with [this] question have almost uniformly embraced adverse domination").

Here, the Trustee undercuts his own argument by citing *Resolution Trust Corp. v. Armbruster*—where the Eighth Circuit declined to infer that the Arkansas Supreme Court would recognize the adverse domination doctrine.[57]

---

57. And, although *it is not facially recited in Armbruster,* Arkansas law does recognize the discovery rule in fraud cases. *Talbot v. Jan-* *sen,* 294 Ark. 537, 744 S.W.2d 723, 725 (1988).

On the substance of the doctrine, the case is actually stronger for an inference that the Minnesota Supreme Court would *not* recognize tolling from adverse domination. In *Antone v. Mirviss*, 720 N.W.2d 331, 335 (Minn.2006), the court noted that, for the general (non-statutory) consideration of tolling and accrual on equitable grounds, it had previously rejected both the "occurrence" rule and the "discovery" rule, in favor of the intermediate "damage" rule. Under the damage rule, "the cause of action accrues and the statute of limitations begin to run when 'some damage has accrued as a result of the alleged malpractice....'" 720 N.W.2d at 335–336. And, *Antone* cites to an earlier, more comprehensive statement of approach to a standard on the interaction between the accrual and the tolling of causes of action. In that opinion, the Minnesota Supreme Court noted:

> Under our statutes it has been determined that ignorance of a cause of action not involving continuing negligence or trespass, *or fraud on the part of the defendant*, does not toll the accrual of a cause of action. Since *Cock v. Etten*, 12 Minn. 522 (1867), we have adhered to the rule that except where relief is sought on the ground of fraud the statute provides no exception in favor of those who may be ignorant of the existence of the cause of action.

*Dalton v. Dow Chem. Co.*, 280 Minn. 147, 158 N.W.2d 580, 584 (1968).

It appears that the Minnesota courts have repeatedly rejected the use of a generalized discovery rule where the discovery allowance of Subd. 1(6) does not apply. Thus, the platform for an extension to the adverse-domination variant is not present. The doctrine cannot be applied on an inference that the Minnesota Supreme Court would recognize it in this litigation.[58]

### 4. Conclusion, as to Other Tolling Doctrines.

The defense characterizes the Trustee's assertion of multiple tolling doctrines as part of an effort to lever the judicial creation of a wide-ranging remedy of "Ponzi scheme disgorgement," one that would have little substantive limit. The accusation is overstated, but there is much to be said for the caution from which it springs. Such expansiveness should be engaged in by the legislative branch—or if by the courts, then on the appellate level after a thorough and more distanced vetting of all dimensions of policy.

Thus, *Ruling # 3B:* The discovery allowance of Subd. 1(6) is the only basis on which the Trustee may obtain an easing or extension of that six-year period. The doctrines of fraudulent concealment, equitable tolling, and adverse domination are not available to him as bases for tolling as a matter of law, or they do not lie on their

---

**58.** This does not even get to the application of adverse domination on its merits. As to that, the Trustee elides the content of the doctrine itself. The domination that he would parlay to a tolling is the total control that he alleges that Tom Petters had over all persons and entities involved in the operation of the Ponzi scheme. Such control may have enabled Petters to maintain the wall of secrecy, and hence to prevent the discovery of the scheme. But the key to the doctrine's equitable override is domination that is adverse to the injured party-plaintiff, *and* that is in fact exploited in direct adversity to the injured party by persons that otherwise would be (and eventually are) named as defendants. The Trustee does not plead anywhere that any of the defendants so dominated any instrumentality of the Ponzi scheme, or through which the circumstances of the fraud could have been detected. With very few exceptions, he has not even alleged that any of the defendants had any knowledge of the operation of a fraudulent scheme, or any notice of the possibility of such.

merits on the configuration of parties in the Trustee's litigation.

## ISSUE # 4: DATE OF COMMENCEMENT OF SUIT. *Fed.R.Civ.P. 3 v. Minn. R. Civ. P. 3.01(a):* Filing of Complaint or Service of Process

■ The fourth common issue under the rubric of timeliness of suit affects a smaller number of defendants. The movants for dismissal on this narrower ground are those defendants who were put into suit at the Trustee's instance late in the large-scale initiation of the avoidance litigation, and who received service of a summons and complaint after the deadline of § 546(a)(1)(A) had passed.[59] They argue that this rendered the action against them untimely-commenced.

The underlying theory stems from the difference between federal and Minnesota state law, as to the act that commences a lawsuit. Under Fed.R.Civ.P. 3, "[a] civil action is commenced by filing a complaint with the court." [60] Under Minn. R. Civ. P. 3.01(a), "[a] civil action is commenced against each defendant" by service of the summons, under three possible permutations.[61]

The defendants who received the Trustee's summons and complaint in-hand after the deadline seek dismissal on this theory. They insist that the Minnesota state law governs the means of commencing suit for this litigation. This, they argue, is a consequence of the Trustee's substantive reliance on MUFTA through the empowerment of § 544(b), and the applicability of Minnesota law's statute of limitations. The underlying rationale is that the long-standing *Erie* doctrine, i.e., *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny, requires the application of the Minnesota rule for commencement of an action for the purposes of limitations periods and deadlines for suit. More specifically, they cite *Walker v. Armco Steel Corp.*, 446 U.S. 740, 752–753, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980), in which the Supreme Court held that *Erie* compels federal courts to apply rules for tolling under state law where claims under state law are sued in federal court.

*Walker,* however, was decided in a case under the federal district court's diversity-of-citizenship jurisdiction, 28 U.S.C. § 1332(a). Under that provision, the district court may entertain original jurisdiction over actions that are governed by state substantive law alone, as long as the action is "between ... citizens of different States," or when citizenship (or in the case of "a foreign state," identity) is otherwise diverse between opposing parties in its national character.

The Trustee's avoidance claims, however, were expressly pleaded into suit under the bankruptcy jurisdiction of the federal courts, 28 U.S.C. § 1334(b).[62] The Trustee sues in the context of a bankruptcy pro-

---

**59.** As the Trustee's counsel points out, there is no allegation from any defendant that any complaint was filed after that date.

**60.** By operation of Fed. R. Bankr.P. 7003, this rule applies to adversary proceedings in bankruptcy cases.

**61.** The variants are: by direct service; via acknowledgment after delivery by mail; and as of the date of delivery to a sheriff for service as long as actual service is made within 60 days.

**62.** Given the specific limitations on a bankruptcy judge's authority under the "division of labor" within the statutory framework for federal jurisdiction over bankruptcy cases and proceedings, *Stern v. Marshall,* —— U.S. ——, ——, 131 S.Ct. 2594, 2620, 180 L.Ed.2d 475 (2011), a bankruptcy judge could not preside over a civil lawsuit under the federal courts' diversity-of-citizenship jurisdiction.

cess that is authorized and governed by federal laws. He invokes federal law for his empowerment to bring suit on his theories, § 544(b). His standing under § 544(b) derives from the right of suit that state law grants to a creditor, yes; and the scope of relief available to him is delimited by principles contained in state statute. But nonetheless, his "strong-arm" claims are "based on federal law." Were it not for his empowerment by § 544(b), a federal statute, he would not be able to sue them out in his fiduciary capacity and they would not be before a federal court.

Obviously, the Trustee relied on the governance of Fed.R.Civ.P. 3 in timing the commencement of suit against his deadline under § 546(a)(1). That reliance did not render untimely any adversary proceeding in which he served a summons and complaint after that deadline.

The fact that Minnesota law governs the issues relating to the limitations period does not alter that conclusion. *See West v. Conrail,* 481 U.S. 35, 39, 107 S.Ct. 1538, 95 L.Ed.2d 32 (1987) ("... when the underlying cause of action is based on federal law and the absence of an express federal statute of limitations makes it necessary to borrow a limitations period from another statute, the action is not barred if it has been 'commenced' in compliance with Rule 3 within the borrowed period."). Here, specific federal law governs the commencement of suit. As a result, a federal court need not look to nonfederal law for a rule of decision. *West v. Conrail,* 481 U.S. at 39, 107 S.Ct. 1538 ("we borrow only what

is necessary" when a limitations period is taken from non-federal law for a federally-based cause of action). The result must be the same: the Trustee timely-commenced as long as he filed his complaints by the deadline under § 546(a)(1).[63]

So, *Ruling #4:* All of the adversary proceedings that the Trustee now maintains were commenced on the date on which their respective complaints were filed in this court. For the purposes of the deadline under § 546(a)(1)(A), an adversary proceeding was commenced timely as long as the complaint was filed by the deadline specified in that statute, as to the bankruptcy case in which it was commenced.

## ISSUE # 5: MEANS OF SERVICE OF COMPLAINT.

### Minn. R. Civ. P. 4.03(a)–(c) versus Fed. R. Bankr.P. 7004(b)(1) and (3).

■ A fifth matter requires treatment because it was classified with this round of issues and placed onto the agenda for the first day of oral argument.[64] It got its place during the formulation of the "consolidated issues" procedures because some party or parties insisted in an informal way that enough defendants had raised it to make it "common." It seemed that it would turn on an application of law alone; and hence it was deemed appropriate for early attention and ruling, via inclusion in procedures orders for the hearings.[65]

When the first hearing on oral argument was convened, the issue was an orphan.

---

63. One can only imagine how satellite litigation would multiply were the defendant's argument adopted. Trustees in bankruptcy often combine counts under both federal and state law in their avoidance litigation. The rule suggested by the defense would result in much controversy over limitations periods where the trustee initiated the litigation as the deadline under § 546(a)(1) approached.

64. This was last done in an order under Dkt. No. 1323.

65. This issue is not among the 16 for which the Trustee aggregated claiming defendants in the appendix to his Omnibus Memorandum of Law.

The defense presented no oral argument on it. The Trustee's counsel expressed some doubt as to whether it was still at issue. Nonetheless, it is straightforward enough; it is easily resolved as a matter of law; and a ruling will aid those parties concerned with it in evaluating the future litigation.

Through their motions, one or more defendants asserted that they had not been properly served with the Trustee's summons and complaint. For the purposes of treating the issue, it will be assumed that the Trustee served all relevant defendants under the means permitted by Fed. R. Bankr.P. 7004(b)(1) and (c)—that is to say, by a simple "mailing of the summons and complaint" via the United States Postal Service, first-class mail, postage prepaid, to the address designated for the class of defendant for which those rules apply.[66]

The defense argument is that this means of service was improper, because the Trustee exclusively or predominantly relies on state law for his theories of recovery against them. As the defense would have

it, this required the Trustee to use the means of service prescribed by the forum that provided the substantive legal governance. Here, that would be the state of Minnesota, and Minn. R. Civ. P. 4.03 (2010).

The Minnesota rule requires service by "delivering a copy" of the summons.[67] So, these defendants maintain, by relying on first-class mail the Trustee did not serve them properly. Hence, they argue, his lawsuits against them are in a defective posture that must be addressed now.[68]

In the federal courts, this issue is confined to the bankruptcy court.[69] The Federal Rules of Bankruptcy Procedure have authorized service of process by first-class mail in an adversary proceeding since their promulgation under their current organization in 1983. (And, at that time, Rule 7004 expressly preserved the allowance for service by mail under former Rule 704, as promulgated in 1976 for cases under the Bankruptcy Act of 1898.) Report of Advisory Committee on Bankruptcy Rules to Committee on Rules of Practice and Pro-

---

**66.** Rule 7004(b)(1) applies to "an individual other than an infant or incompetent." Rule 7004(b)(3) applies to "a domestic or foreign corporation or ... a partnership or other unincorporated association."

**67.** The delivery may be made "personally or by leaving ... at ... usual place of abode" for an individual defendant. Minn. R. Civ. P. 4.03(a). For defendants that are not natural persons, delivery would be to persons with designated capacities for the defendant. Minn. R. Civ. P. 4.03(b)-(c).

**68.** This issue would have been properly classified as a timeliness-of-suit dispute, had the outcome on the issue of commencement of suit required service rather than filing. That did not happen. Absent that, improper service would raise other concerns, Fed.R.Civ.P. 4(m), *as incorporated by* Fed. R. Bankr.P. 7004(a); but they would be subject to judicially-prescribed cure and need not lead to dismissal. *Id.*

**69.** Absent a defendant's waiver of formal service pursuant to Fed.R.Civ.P. 4(d), service in a civil action in the district court is made by "delivering a copy of the summons and complaint," by permissible variations of in-hand presentation comparable to those under the Minnesota rule. Fed.R.Civ.P. 4(e) and (h). The civil rules impose a "duty to avoid unnecessary expenses of serving the summons," Fed.R.Civ.P. 4(d)(1), and hence parties are encouraged to waive formal service by delivery. However, in the district court the fallback minimum for the notice to a defendant that it is being sued remains personal receipt of process via in-hand delivery, in the immemorial tradition of the courts. As to the special circumstances of litigation and notice within bankruptcy cases that underlie the option to use first-class mail for service, *see In re McElhaney*, 142 B.R. 311, 313 (Bankr. E.D.Ark.1992).

cedure of the Judicial Conference of the United States (Aug. 9, 1982), at XXIV (accessible at [http://www.uscourts.gov/RulesAndPolicies/rules/archives/reports-judicial-conference.aspx]). The defense's contention is novel in this district; given the long experience with service of process by mail in bankruptcy litigation; it is not clear why there is an issue.

■ In the end, this is a non-issue. Under basic choice-of-law principles, the forum court prescribes the means of service of process, whether the governing substantive law is its own or that of another jurisdiction. *Pritchard v. Norton*, 106 U.S. 124, 129–130, 1 S.Ct. 102, 27 L.Ed. 104 (1882) ("The principle is that whatever relates merely to the remedy and constitutes part of the procedure is determined by the law of the forum, for matters of process must be uniform in courts of the same country."). Fed. R. Bankr.P. 7004(a)(1) *permits* a plaintiff to use the means of service provided by Fed.R.Civ.P. 4(e)-(j). In turn, Fed.R.Civ.P. 4(e)(1) and 4(h)(1)(A) *allow* service "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the [federal] district court is located or where service is made." However, these means of service only cumulate with the options permitted in those rules themselves.[70]

To the point at bar, however: the plaintiff in an adversary proceeding has the option to use *any* of the alternatives. *In re Lencoke Trucking, Inc.*, 99 B.R. 200, 201 (W.D.N.Y.1989). The Eighth Circuit has recognized that service by mail in compliance with Rule 7004(b) is given full effect in the federal courts. *Stephenson v. El–Batrawi*, 524 F.3d 907, 911 and n. 5

(8th Cir.2008). See *also In re Otto*, 409 B.R. 912, 916 (Bankr.D.Minn.2009).

So, *Ruling # 5:* The Trustee was not obligated to make service of summons and complaint by personal delivery to any defendant. As long as he complied with the requirements of Fed. R. Bankr.P. 7004(b), he made effective service on any defendant for which he used first-class mail, postage prepaid to send his complaint and the summons to an appropriate address.

## CONCLUSION

To reprise the rulings on this group of issues presented in the abstract as matters of law:

*Ruling # 1:* The Trustee's avoidance claims under MUFTA are subject to a six-year limitations period. However, the discovery allowance of Subd. 1(6) may operate to extend the scope of transfers subject to avoidance to those made before that six-year period, if the Trustee proves the factual basis for it.

*Ruling # 2:* As long as the Trustee commenced any individual action in this avoidance docket by the deadline under § 546(a)(1), his avoidance power can reach, at minimum, transfers that took place within the full length of the six-year base limitations period under Subd. 1(6), dating back from the date of the subject Debtor's bankruptcy filing.

*Ruling # 3A:* The extension of avoidance at the Trustee's instance under color of the discovery allowance of Subd. 1(6) to any transfer that took place earlier than the six-year base period of that subdivision will turn on whether the predicate creditor for a particular adversary proceeding had discovered the facts constituting the fraud of the Petters Ponzi scheme, as they applied to such a transfer.

---

**70.** The means of service under civil Rule 4 were added to those previously prescribed by the bankruptcy rules, in that first post-Code

promulgation in 1983. Report of Advisory Committee on Bankruptcy Rules (1982) at XXIV.

***Ruling # 3B:*** The discovery allowance of Subd. 1(6) is the only basis on which the Trustee may obtain an easing or extension of that six-year period. The doctrines of fraudulent concealment, equitable tolling, and adverse domination are not available to him as bases for tolling as a matter of law, or they do not lie on their merits on the configuration of parties in the Trustee's litigation.

***Ruling # 4:*** All of the adversary proceedings that the Trustee now maintains were commenced on the date on which their respective complaints were filed in this court. For the purposes of the deadline under § 546(a)(1)(A), an adversary proceeding was commenced timely as long as the complaint was filed by the deadline specified in that statute, as to the bankruptcy case in which it was commenced.

***Ruling # 5:*** The Trustee was not obligated to make service of summons and complaint by personal delivery to any defendant. As long as he complied with the requirements of Fed. R. Bankr.P. 7004(b), he made effective service on any defendant for which he used first-class mail, postage prepaid to send his complaint and the summons to an appropriate address.[71]

The law thus laid out will apply to each remaining motion for dismissal according to the individual posture of each defendant. How, when, and whether that is to be effected will be determined once the remaining "consolidated issues" and other prerequisites receive ruling. After that, the future of this litigation will be addressed with counsel at a status conference.

___

71. Certain other issues nominally placed with these by the Trustee or the defense are reserved to the second memorandum. That memorandum will focus on issues over the adequacy of the Trustee's pleading, as presented on the second day of oral argument.